**GUILLORY FARMS, INC., Appellant,**

v.

**AMIGOS CANNING CO., INC., Appellee.**

No. 09–95–063 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Feb. 19, 1998.

Decided April 9, 1998.

Richard G. Baker, Zack M. Zbranek, Baker & Zbranek, Liberty, for appellant.

Julie Karee' Cain, Liberty, Gene Toscano, San Antonio, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

STOVER, Justice.

This case involves a dispute on the interpretation of the terms of a written contract for the sale of rice. Appellant, the seller, sued appellee, the buyer. The case was tried to a jury and the jury rendered a verdict that appellee failed to comply with the agreement, but appellee's failure to comply was excused. The trial court entered judgment on November 28, 1994, that appellant take nothing. Appellant appeals the take nothing judgment, seeking a reversal of the judgment and either a rendition on the record or a remand for a new trial.

## FACTUAL BACKGROUND

In 1989, the Texas Department of Agriculture pursued a policy of encouraging farmers to market processed farm products directly to buyers and finding buyers willing to purchase the products directly from the farmer. Roosevelt Guillory, who farmed rice in Jefferson and Chambers Counties with his sons, enrolled in the program. To facilitate the objective of direct marketing of milled and ready to cook rice, Guillory formed Guillory Farms, Inc. ("Guillory Farms"), a Texas corporation, through which Roosevelt Guillory and his sons would sell their crop.

Through the Department of Agriculture's program, Roosevelt Guillory met Ralph Velasco, the president and representative of Amigos Canning Co., Inc. ("Amigos"). Amigos, a long established company based in San Antonio, Texas, was in the business of canning and processing food products for resale. Mr. Velasco had been contacted by the Texas Department of Agriculture when the department learned Amigos was getting ready to process a rice product.

In keeping with its newly devised policy, the Commissioner of Agriculture's staff felt these two different minority race-owned businesses would successfully showcase the de-

partment's program. Ostensibly, both parties would profit by eliminating the "middleman." This, of course, proved to be purely hypothetical, as Roosevelt Guillory was unwittingly thrust into the position of "middleman" to his detriment.

As a result of meetings arranged by the Texas Department of Agriculture, Amigos agreed to buy rice from Guillory Farms; Amigos needed the rice to fill a canning contract of a new product for a third party named En Casa. En Casa would market the finished product as a canned "ready to cook" rice dish. Amigos desired rice of a grade and quality known as "No. 2 Long Grain—4% breakage," which Roosevelt Guillory and his sons, through Guillory Farms, Inc., could provide. Prior to the execution of the contract, Amigos purchased rice from Guillory twice without a written contract and Amigos was satisfied with Guillory's product. Rice of this type, grade, and quality is a fungible product, commonly grown in Jefferson, Chambers, Liberty and other southeast Texas counties.

At the time of the contract negotiations, the market price of milled rice of the type, grade and quality Amigos desired was approximately thirteen cents per pound. Raw ("harvested") rice was being sold by the farmers directly to the mill for approximately six to seven cents per pound; the cost of milling the raw rice was about six or seven cents per pound. Amigos and Guillory Farms negotiated a price of nineteen cents per pound, a price substantially greater than Guillory could have obtained selling raw rice directly to the local rice mills. However, apparently overlooked in this venture was the fact that the rice mills plays an important role in a rice farming operation. The mill is necessary for processing the rice—drying, husking, grading, storing, and sacking. In addition, the mill plays a pivotal role in paying off the different liens the farmer may owe to the bank, land owner, and other suppliers. Also apparently overlooked was the fact that the contract stipulated delivery to buyer by seller, with Guillory Farms providing such transportation. Guillory Farms was not set up to make deliveries. Thus, considering the additional expenditures necessitat-

ed by this contract, this venture was not as profitable as it appeared on paper.

After negotiations between the parties, the contract, which was to be a very simple agreement for the sale of rice, was prepared by Guillory's attorney and submitted to Velasco. Revisions were made by Velasco and the parties concluded their negotiations by entering into a written sales contract dated October 12, 1989. The contract required Amigos to buy and Guillory Farms to sell an estimated amount of one million, two hundred thousand pounds (1,200,000 lbs.) of No. 2 Long Grain rice with 4% breakage, at nineteen cents a pound, during an eleven month period beginning October 10, 1989, and ending September 10, 1990. The parties agreed Guillory Farms would deliver the rice to Amigos in increments during the October 1989 through September 1990 contract term in the amount and at the time Amigos requested delivery. There were no set dates for delivery.

At the time Guillory Farms contracted with Amigos, Roosevelt Guillory and his sons had grown and placed in storage with Doguet's Rice Mill of Beaumont, Texas, enough rice of the proper type, grade, quality, and variety to fill the contract. Guillory Farms intended to fill the contract with this rice and the rice harvested from the efforts of Roosevelt Guillory and his sons the next crop year. As a precaution, Guillory made arrangements with other farmers and rice mills to ensure that, at all times, there would be enough rice to meet the contract demand.

The typical growing season for rice in southeast Texas begins with planting in April followed by harvesting in August and drying in September. Consequently, it appeared that Guillory Farms would provide Amigos with rice during the off-season with rice already harvested and, if more were required, with rice from the upcoming 1990 growing season.

The En Casa product did not sell in the marketplace as well as anticipated and as a result Amigos no longer needed further shipments of rice. Amigos' need for rice was based solely upon its contract with En Casa. Amigos could not market and resell this particular product itself because of En Casa's

exclusive rights to the formulas being packed under the En Casa label.

Of the 1.2 million pounds of rice which was contracted, Amigos only requested three deliveries totaling 9,500 pounds. This turn of events placed Roosevelt Guillory in an awkward financial position. Without receiving the anticipated revenues from the deal between Amigos and Guillory Farms, Roosevelt Guillory and his sons were forced into selling rice to others to pay their bills. Of the rice which Roosevelt Guillory had originally secured to fill the contract, only 426,772 pounds remained at Doguet's Rice Mill for immediate shipment.

· In an attempt to salvage the business, Roosevelt Guillory continued to call upon Amigos to take and pay for the balance of the rice. After repeated attempts by Guillory to convince Amigos to take further shipments, Velasco informed Guillory that Amigos would not accept or pay for any more rice.

Guillory Farms then requested Amigos' help in selling the rice. Through a broker, Amigos found an overseas buyer who was willing to negotiate the purchase of one million, two hundred pounds of rice if Guillory was able to verify proof of ownership. The corporation was unable to provide the proof and the buyer was lost.

As a consequence of Amigos' refusal to take the balance of the rice, both Guillory Farms (the corporation) and Roosevelt Guillory (the principal through whom the corporation operated) went out of business. Guillory Farms then brought suit against Amigos alleging it was entitled to lost profits on the sale of 1.2 million pounds of rice it had agreed to sell to Amigos and Amigos had refused to comply.

The pertinent portions of the contract provided:

> This agreement made effective on the 18th day of September, 1989, between GUILLORY FARMS, INC .... hereinafter referred to as "Seller" and AMIGOS CANNING CO. INC., ... hereinafter referred to as "Buyer".

### I.

Seller agrees to sell and Buyer agrees to buy for the period beginning October 10, 1989 and ending on September 10, 1990 all of the rice, of the quality and variety and at the prices specified in the schedule marked Exhibit "A", attached hereto and incorporated herein by reference, now growing or to be grown by the Seller on the real property located in the Counties of Jefferson and Chambers, State of Texas, subject to the following terms and conditions:

### II.

### WARRANTY BY SELLER

Seller warrants that the title to the rice conveyed shall be good and its transfer rightful. Further, Seller warrants that the rice shall be delivered free from any security interest, lien or encumbrances on the rice which is the subject of this Contract.

. . . .

### IV.

### POINT OF DELIVERY

The rice shall be delivered by the Seller to the Buyer at his warehouse, 224 Wilmot, San Antonio, Texas, hereinafter referred to as Point of Delivery. The Seller shall receive a transportation allowance of $1.00 per hundred weight for each load delivered by the Seller to the Buyer's Point of Delivery.

. . . .

### VII.

### PREVENTION OF PERFORMANCE

Should performance of this Contract by either party be prevented or delayed by act of God, war, civil insurrection, fire, floor, storm, strikes, lockouts, total or partial failure to transportation or delivery facilities, interruption of power, or by any law, regulation, or order of any federal, state, county, or municipal authority, or by any other cause beyond the control of such

party, that party's performance shall be excused to the extend [sic] it is so prevented or delayed. *However, should Buyer's performance be prevented or delayed by any such cause, Buyer may during such period accept portions of the rice as it deems, in its sole judgment, it can economically process.* Any rice not accepted by Buyer because of the provisions of this paragraph shall be automatically released to Seller for sale or disposal elsewhere. (emphasis added)

. . . .

## IX.

## BREACH

In the event of a breach of the terms of this Agreement, this Agreement may be enforced in Chambers or Liberty County, Texas, and the prevailing party shall be entitled to reasonable attorney's fees for the enforcement of the terms and conditions.

## X.

## SOLE AGREEMENT

This agreement constitutes the sole agreement between the parties concerning the rice. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Contract are of no force and effect. This Contract may not be amended, modified, or added to except by a writing duly signed by both parties.

. . . .

## EXHIBIT "A"
## SCHEDULE OF PURCHASES

The following rice has been purchased and sold pursuant to the attached Contract, effecvtive [sic] as of the 18th day of September, 1989, and executed by AMIGOS CANNING CO., INC., as Buyer and GUILLORY FARMS, INC., as Seller:

| VARIETY/GRADE OF RICE | ESTIMATED AMOUNT | PRICE |
|---|---|---|
| No. 2 Long Grain— | 1 million | 19 cents |
| 4% breakage | 200,000 pounds (1.2 mm lbs) total to be sold over twelve (12) month period from October 10, 1989 | per pound |

At trial, neither party chose to call the contract ambiguous and were content to let the jury decide intent, if there was a breach, and if so, was it excused. The court gave detailed instructions on the issues raised by the evidence. Upon the court's charge, the jury found that Amigos had agreed to buy 1,200,000 pounds of rice from Guillory at a price of nineteen cents per pound, that Amigos failed to comply with the agreement, but that Amigos' failure to comply was excused. After the hearing on Guillory's motions for judgment and judgment n.o.v., the trial court entered judgment on November 28, 1994, that Guillory take nothing and denied Guillory's motions for judgment and judgment n.o.v. Guillory's motion for new trial was overruled by operation of law. Appellant timely perfected this appeal and presents five issues for our review.

## ISSUES PRESENTED

**Issue No. 1:** *(No Evidence/Legal Insufficiency).* There was no evidence as a matter of law to support the jury's answer to Jury Question No. 3 that Amigos' failure to comply with its agreement to buy 1,200,000 pounds of rice from Guillory at the price of 19 cents per pound was excused and, therefore, the trial court erred in refusing to grant judgment for Guillory or a new trial.

**Issue No. 2:** *(No Evidence (Factual Insufficiency)).* The evidence was factually insufficient to support the jury's answer to Jury Question No. 3 that Amigos' failure to comply with its agreement to buy 1,200,000 pounds of rice from Guillory at the price of 19 cents per pound was excused and, therefore, the trial court erred in refusing to grant Guillory a new trial.

**Issue No. 3:** *(Overwhelming Contrary Evidence/Manifestly Unjust).* The overwhelming weight of the evidence was contrary to jury's answer to Jury Question No. 3 that Amigos' failure to comply with its agreement to buy 1,200,000 pounds of rice from Guillory at the price of 19 cents per pound was excused, and therefore, the jury's finding is manifestly unjust and the trial court erred in refusing to grant a new trial.

**Issue No. 4:** *(Conclusive Contrary Evidence).* The evidence, as a matter of law, conclusively establishes the contrary to the jury's answer to Jury Question No. 3 that Amigos' failure to comply with its agreement to buy 1,200,000 pounds of rice from Guillory at the price of 19 cents per pound was excused, and therefore, the trial court erred in refusing to grant judgment for Guillory or a new trial.

**Issue No. 5:** *(Damages, Attorney's Fees and Costs).* If the court holds that there was legally no evidence to support the jury's answer to Jury Question No. 3 that Amigos' failure to comply with its agreement to buy 1,200,000 pounds of rice from Guillory at the price of 19 cents per pound was excused, Guillory is entitled to judgment as a matter of law awarding Guillory damages pursuant to Texas Business & Commerce Code § 2.708(b), plus prejudgment interest and reasonable and necessary attorney's fees on this suit for breach of contract pursuant to the contract itself and Texas Civil Practice & Remedies Code §§ 33.001, *et seq.*

## JURY QUESTIONS

### QUESTION 1

Did Amigos Canning Co., Inc., agree to buy 1,200,000 pounds of rice from Guillory Farms, Inc., at a price of 19 cents per pound?

Answer[:] "Yes" or "No"

Answer: *(Yes)*

You are instructed that in answering Question 1, you should consider the entire contract, all of the evidence presented, and the course of conduct of the parties.

If you have answered Question 1 "Yes," then answer Question 2. Otherwise do not answer Question 2.

### QUESTION 2

Did Amigos Canning Co., Inc., fail to comply with the agreement?

Answer: "Yes" or "No."

Answer: *(Yes)*

If you have answered Question 2 "Yes," then Answer Question 3. Otherwise, do not answer Question 3.

### QUESTION 3

Was Amigos Canning Co. Inc.'s failure to comply excused?

Answer: "Yes" or "No."

Answer: *(Yes)*

If you answered Question 3 "No," then answer Question 4. Otherwise, do not answer Question 4.

In following the court's instructions, there was no need for the jury to answer the remaining five questions of the court's charge. The five issues presented by the appellant center around the jury's answer to Question 3 of the court's charge. The general instructions in the court's charge gave definitions of a force majeure clause, covenants, failure to comply, failure to perform, and that failure to comply is excused if stated circumstances occurred. There were no objections to the charge by appellant.

## STANDARDS OF REVIEW

This appeal is concentrated upon the jury's answer of "Yes" to Question 3 which found that Amigos' failure to comply was excused. Basically, appellant urges that there is no evidence to support the answer; there is insufficient evidence to support the answer; the overwhelming weight of the evidence contradicts the answer; and, the evidence conclusively negates the answer.

In passing on the "no evidence" point we may consider only the evidence and the inferences therefrom which tend to support the jury's verdict and disregard all the evidence and inferences to the contrary which are against the verdict and the findings of the jury. *Garza v. Alviar* 395 S.W.2d 821, 823 (Tex.1965).

A "no evidence" point, which actually complains that the evidence is insufficient as a matter of law to support the finding complained of, may be sustained if the record demonstrates any of the following: 1) the record discloses a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or 4) the evidence establishes conclusively the opposite of a vital fact. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997); *Koch Oil Co. v.*

*Wilber*, 895 S.W.2d 854, 861 (Tex.App.Beaumont 1995, writ denied).

When reversal is sought on the ground of insufficiency of evidence to support a jury finding or on the ground that a jury finding is against the great weight and preponderance of the evidence, the following standards govern. The court of appeals must consider and weigh all of the evidence and should set aside the verdict *only* if it is so contrary to the overwhelming weight of the evidence as to be *clearly wrong and unjust. Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The court is not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable; the court may not substitute its thought processes for those of the jury. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986). The court must be prepared to detail the evidence relevant to the issues under consideration and clearly state why the jury findings are factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust, why the findings shock the conscience, or why the findings clearly demonstrate bias. *Id.* at 635. The Court must be able to state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. *Id.* Reversal is authorized only if the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d at 661. The court reviews the evidence in the light most favorable to the jury's finding (or refusal to find) and every reasonable inference is to be indulged in favor of the verdict. *Dodd v. Texas Farm Prods. Co.*, 576 S.W.2d 812, 814 (Tex.1979). Only the evidence and inferences therefrom that support the jury's findings should be considered, with all contrary evidence and inferences being rejected. *Id.* at 814–15.

When there is conflicting evidence, it is the jury's function to decide credibility issues and the court should uphold the jury's finding unless it would be clearly wrong and

manifestly unjust to do so. *City of Princeton v. Abbott,* 792 S.W.2d 161, 163 (Tex.App.—Dallas 1990, writ denied); *Drake v. Holstead,* 757 S.W.2d 909, 912 (Tex.App.—Beaumont 1988, no writ). The jury determines the credibility of the witnesses and weighs the evidence. *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (Tex.1962). The jury may believe one witness and disbelieve others. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). The jury may also resolve any inconsistencies in the testimony of any witness. *Id.* Accordingly, the mere fact that there is testimony in the record does not mean that the jury was required to give it any weight. *Pilkington v. Kornell,* 822 S.W.2d 223, 230 (Tex.App.—Dallas 1991, writ denied).

## ANALYSIS

The jury in this case, with broad form questions being utilized, was called upon to make interpretations of the wording in several sections of the contract/agreement between the parties involved, with special emphasis upon paragraph VII, the prevention of performance clause. In *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 790 (Tex.1995) we find:

> Broad form submission is now mandated by our Rules of Civil Procedure whenever feasible. *See* Tex.R.Civ.P. 277; *Texas Dep't of Human Services v. E.B.,* 802 S.W.2d 647 (Tex.1990). The court is required to submit such questions, definitions and instructions "as shall be proper to enable the jury to render a verdict." Tex.R.Civ.P. 277.

The jury answered Question No. 3 on a broad form submission charge that Amigos was excused from complying with the contract.

*Fraud and Misrepresentation*

■ At trial, Amigos argued that it was excused from complying with the contract because Guillory's actions amounted to fraud and misrepresentation. Amigos contended that Guillory Farms never owned any rice and never farmed any rice in Jefferson and Chambers counties as promised during the contract period. Amigos focused upon the legal distinction of Roosevelt Guillory, individually, and Guillory Farms, the corporation; it argued Guillory Farms was not able to prove that during the contract period, the leased crop land or the harvested, stored rice was under the name of Guillory Farms. In addition, Amigos argued that when it found a substitute buyer for the rice, Guillory Farms was not able to prove ownership.

When Guillory Farms executed the agreement, Guillory Farms (the corporation) owned no rice, even though Exhibit "A" attached to the contract recited "the following rice has been purchased and sold" September 18, 1989. However, Roosevelt Guillory, along with his sons, did have the 1.2 million pounds of rice in storage to fill the contract. The contract recited Guillory Farms itself was to grow the rice in Jefferson and Chambers counties. Guillory Farms argued that the association of Roosevelt Guillory with his sons and neighbors was necessary in an effort to show that together they could have farmed the needed rice. It claimed No. 2 long grain rice is the same regardless, so why should Amigos complain if the corporation did not farm the rice and the rice did not come from Jefferson and Chambers counties?

The testimony of Mike Doguet, the rice mill owner, was factual and straightforward. Testifying from his business records, Mr. Doguet verified the nonownership of Guillory's rice, the fact that the one lease Roosevelt Guillory did have in 1990 was insufficient to harvest 1.2 million pounds of No. 2, long grain, finished rice and that Roosevelt Guillory had sold all of his rice to the government prior to signing the contract with Amigos. Doguet also brought out inconsistencies in Guillory's testimony, including the fact Guillory could not have provided the rice called for in the contract without buying it from the mill or somebody else.

*Prevention of Performance Clause*

■ Amigos also relied on paragraph VII of the contract—the prevention of performance clause—as another basis upon which

its noncompliance was excused. During the contract negotiations and revisions Velasco expressed concerns about being "locked into the contract." Guillory Farms' discussion of the third party contract between En Casa and Amigos explains Amigos' reason for insisting on its right to refuse product. En Casa had given Amigos a large order for canned ready-to-eat rice, a new product in the market. Amigos' long experience in its business dictated that the new product might not sell well.

During trial, the parties disagreed over whether the clause should be referred to as a "force majeure" or a "prevention of performance" clause. A typical force majeure clause speaks of acts of God or unforeseeable powerful forces causing prevention of performance of the contract. However, paragraph VII extended beyond a typical force majeure clause. The clause contained a provision that in the event of a cause beyond the control of either party to the contract, that party's performance shall be excused to the extent it is so prevented or delayed. However, the clause additionally provided that, if such event occurred, the buyer (Amigos), in its sole judgment, could accept portions of the rice as it deemed it could economically process.

Guillory Farms claimed that paragraph VII was similar to a force majeure clause and its disputed contract should receive that type of interpretation. However, Guillory Farm's attorney testified that paragraph VII went beyond a force majeure clause when it added the portion concerning "economically process." Velasco testified that he thought the clause meant that, in the sole judgment of Amigos, he was required to accept only the amount of rice that he could economically use. He testified that he would not have signed the contract if he thought he would have been obligated with purchasing the entire 1.2 million pounds of rice.

Guillory went into great detail about the contract Amigos made with the third party

buyer, En Casa, and the fact En Casa was to pay $25,000.00 yearly to Amigos when it withdrew its canning order.[1] The contract between Amigos and Guillory Farms did not condition Amigos' performance on any outlet contract nor did it address any specific venture or assumption involving the resale of the rice to a third party.

Terms that are in general and common use to express one meaning are often given a different and special meaning by the people of a trade, a profession, or a locality. What did the parties mean by "economically process"? This is one of the questions the jury was called upon to resolve.

> There is no single rule of interpretation of language, and there are no rules of interpretation taken all together, that will infallibly lead to the one correct understanding and meaning. In understanding the variable expressions of others, men must do the best they can and results must be determined even though the understanding may be faulty. There is in fact no "one correct" meaning of an expression; and the party choosing the expression may have no clear and conscious meaning of his own.

*See* 3 Arthur L. Corbin, CORBIN ON CONTRACTS § 535 (1960).

The words "economically process" are undoubtedly words of art. They were skillfully inserted into the contract as an escape mechanism. By the insertion of these words of art the Prevention of Performance clause (VII) became not a force majeure clause, but a tailor-made clause to allow Amigos to avoid the performance of the contract in the event market conditions dictated the rice could no longer be "economically processed." The jury obviously concluded if there was no market for the ready-to-eat rice, the company could no longer economically process the rice.

As the evidence unfolds, it reveals a futile, ill-fated attempt by the Department of Agri-

---

**1.** The $25,000 annual payment was revealed to be media credits with several Hispanic radio stations, which had little or no monetary value.

culture to take a good, hard-working rice farmer who could not read proficiently and make him into the very "middle man" they purported to eliminate. While the Texas Department of Agriculture may have had good intentions in its misguided attempts to assist the farmers by promoting direct producer-to-user contacts (eliminating the "middle man"), the end result was taking a good rice farmer out of his area of expertise and placing him into a situation where he had no expertise whatsoever. At the same time, the Department was encouraging the canning companies, or the users of the commodity products, to directly contact the farmers, or producers. Any time our free enterprise system is tampered with, someone, through no fault of their own, receives an injustice when thrust into a position where that individual lacks the necessary training and experience to perform the functions required of that position.

We commend the attorneys for appellant for their zeal and enthusiasm in representing this unsophisticated farmer who just wanted to sell his rice at a decent profit. Having thoroughly reviewed this record for legal and factual sufficiency, we would at this time also commend the trial court, the jury, and counsel for both parties, for the diligence and perseverence given in this matter. The jury certainly gave consideration to all arguments, as evidenced by the 10–2 verdict.

After reviewing the evidence in this case, we are persuaded there is some evidence to support the jury's verdict, therefore, this case must be affirmed. Thus, we find the evidence, both legal and factual, sufficient to uphold the jury's verdict. We conclude the evidence is not so against the great weight and preponderance as to be clearly and manifestly wrong and unjust. We overrule appellant's issues one through four. Since we have resolved the sufficiency issues of the jury's findings, we need not address the damages or attorney's fees issue.

We uphold the jury's verdict and affirm the judgment of the court below.

AFFIRMED.