# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 23, 2022

Lyle W. Cayce
Clerk

No. 21-50352

Allison King,

*Plaintiff—Appellant*,

*versus*

Baylor University,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:20-CV-504

Before Jones, Higginson, and Duncan, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

Allison King signed a Financial Responsibility Agreement ("FRA") with Baylor University to secure her enrollment for the Spring 2020 semester. The FRA required King to pay Baylor for "educational services," and she paid her tuition bill in full. During the second-half of the semester, Baylor responded to the COVID-19 pandemic by severely limiting on-campus activities and opportunities while conducting classes remotely. It did not, however, refund any tuition or fees. King's refund suit relies on various doctrines of contract law. We espy a potential ambiguity in the definition of "educational services" and remand for further consideration of

No. 21-50352

that issue.  Consequently, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this decision.

## I. BACKGROUND

King followed the same process as all Baylor undergraduates to enroll for the Spring 2020 semester.  First, she "logged on to Baylor's student portal, BearWeb . . . , navigated to the Add or Drop Classes page, selected Spring 2020 as the Term for which [she] wish[ed] to enroll, and either entered the course numbers to register . . . , or used the class search function to find desired classes and register."  Baylor listed available undergraduate classes in a catalog that included the following disclaimers:

> It is sometimes necessary or appropriate to change the programs offered. Baylor University retains the right to terminate or change any and all aspects of its educational and other programs at any time without prior notice.
>
> . . . .
>
> The provisions of this catalog do not constitute a contract, expressed or implied, between Baylor University and any applicant, student, student's family, faculty, or staff member. Baylor University reserves the right to withdraw courses at any time, or change fees, tuition, rules, calendar, curricula, degree programs, degree requirements, graduation procedures, and any other requirement affecting students. Changes will become effective at the time the proper authorities so determine, and the changes will apply to both prospective students and those already enrolled. This catalog is a general information publication only, and it is not intended to, nor does it contain all regulations that relate to students.

King attended her classes throughout the entire semester.

No. 21-50352

Second, after receiving a bill from Baylor, King had "to either pay all of the charges on [her] bill or enroll in a payment plan." Before the Spring 2020 semester commenced, King paid $21,421.00 in tuition, a "General Student Fee" of $2,261.00, $1,923.14 for meals (including $1,773.14 toward a meal plan and $150.00 in dining dollars), a "Chapel Fee" of $90.00, and a "Course Lab Fee" of $50.00. King satisfied her financial obligation.

Third, King had to log onto BearWeb and agree that she was "attending Baylor University in [Spring 2020]" and that she read, understood, and agreed to be bound by the FRA during that semester and all future semesters. Numerous class offerings and two payment options were available to King, but she had only one "choice" in the end: Affirm her semester of attendance and consent to the FRA's terms or face disenrollment. King executed the FRA on December 20, 2019. The following portions are most pertinent:

> I understand that when I register or enroll in any class at Baylor University (Baylor) or receive any service from Baylor, I accept full responsibility to pay all tuition, fees, and other associated costs assessed as a result of my registration and/or receipt of services. I further understand and agree that my registration at Baylor and acceptance of the terms of this Financial Responsibility Agreement (Agreement) constitutes a promissory note agreement (i.e., a financial obligation in the form of an educational loan as defined by the U.S. Bankruptcy Code at 11 U.S.C. 523(a)(8)) in which Baylor is providing me educational services, deferring some or all of my payment obligation for those services, and I promise to pay for all assessed tuition, fees, and other associated costs by the scheduled due date as reflected in emails to me; in the invoices, statements, and schedules within the My Account tab of Baylor's electronic billing called the E-Bill System; or in the following link: www.baylor.edu/sfs/duedates.

3

. . . .

> This Agreement supersedes all prior understandings, representations, negotiations, and correspondence between the student and Baylor, constitutes the entire agreement between the parties with respect to the matters described, and shall not be modified or affected by any course of dealing or course of performance.

The Spring 2020 semester began on January 13th and was scheduled to conclude on May 11th. "But on March 11, 2020, as a result of the COVID-19 pandemic, Baylor announced that spring break would be extended one week, through March 22, 2020, and that beginning on March 23, 2020, all on-campus classes would be moved online for the next two weeks, through April 3, 2020." Then, on March 16th, Baylor notified students that it would "extend online instruction . . . for the remainder of the Spring 2020 semester." Baylor further advised students that "dining options on campus [would] be significantly limited, . . . recreational opportunities [would] be unavailable, . . . . [and] that all university activities, events, conferences, and large gatherings would be suspended through the end of the semester." "Given the closure of Baylor's campus," King alleges that she "lost approximately half of the Spring 2020 semester's on-campus classes, activities, and meals." Baylor, according to King, could have remedied these losses by refunding tuition and fees along with meal plans and dining dollars.

With respect to tuition, Baylor decided not to issue any refunds. King, however, complains that she "paid tuition for an on-campus experience with in-person instruction and access to on-campus facilities." King insists that "Baylor charges significantly less for . . . online programs[,]" and that Baylor breached an implied contract with her by not refunding the difference between the amount she paid for in-person educational services and the amount it would have charged for a half-semester of online instruction.

4

No. 21-50352

To demonstrate the alleged price disparity between in-person and online classes, King observes that "a student seeking an MBA from Baylor through the traditional on-campus program would have been charged approximately . . . .$3,570 per term hour", while "the same student seeking the same degree through Baylor's online [MBA] program would have been charged just $1,068 per term hour, representing a 70% discount." She attributes the premium price for in-person instruction to a variety of experiences and amenities that are only available to those physically present on Baylor's campus.[1]

King concedes that there was no difference in "quality between the in-person, on-campus education at Baylor vs. the online-only education from Baylor." Instead, she emphasizes "the simple premise that the in-person, on-campus educational experience commands a higher price than the online-only educational experience." In other words, King is upset about the price she paid for, as opposed to the quality of, Baylor's online classes.

Baylor also decided not to refund money paid for fees, despite the fact that the General Student Fee, Course Lab Fee, and Chapel Fee[2] "specifically cover on-campus facilities and activities." King does not dispute that Baylor continued to provide many student services online (and that the health center

---

[1] King's pleading linked to Baylor's 2019-20 undergraduate tuition and fee schedule, however, which states flatly that "Baylor charges tuition at a flat rate of $42,842 per academic year (fall and spring) for students taking 12 hours or more per semester." She also linked to Baylor's cost of attendance calculator, which shows that every online program is limited to graduate-level students. King also linked to another page depicting only graduate-level online programs.

[2] King avers that all Baylor students pay the Chapel Fee for two semesters, while only "students enrolled in the on-campus program" had to pay the General Student Fee. The Course Lab Fee appears to be tethered to certain classes, which may include online classes.

No. 21-50352

remained operational), but she faults Baylor for not providing these services in-person as agreed to and for then refusing to refund the fees.

Baylor did prorate meal plans "by the daily rate associated with the plan . . ." and gave students a commensurate credit while also rolling any unused dining dollars forward. And certain dining facilities remained operational, though King was unable to return to campus. King received credits for her "meal plan[] and dining dollar payments[,]" but she insists that Baylor must instead refund those payments because she "lost approximately half of the Spring 2020 semester's . . . meals."

King filed this class action against Baylor in June 2020 on behalf of herself and "[a]ll students who paid, or other persons who paid on a student's behalf, Baylor any of the following costs for the Spring 2020 semester: (a) tuition and/or (b) Fees and/or (c) meal plans . . . ."[3] She asserted a breach of contract claim, alternatively sought unjust enrichment, and requested refunds of student fees and prorated tuition reimbursement based on the difference between the fair market value of on-campus education and the online educational product.

Baylor moved to dismiss, contending that the educational malpractice doctrine barred King's claims, and that she otherwise failed to state claims for breach of contract or unjust enrichment.

The magistrate judge recommended granting Baylor's motion and dismissing King's claims with prejudice.[4] The district court adopted the

---

[3] Given that the district court did not certify any class, this court assesses the allegations and claims only with respect to King.

[4] "The educational malpractice doctrine recognizes that professional educators—not judges—are charged with the responsibility for determining the method of learning that should be pursued for their students." *Winter v. Am. Inst. Of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 221 n.11 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).

recommendation over King's objections. The district court found that the FRA was a valid, complete, and integrated contract between Baylor and King; that it did not promise in-person classes or an on-campus educational experience; and that it exclusively governed the parties' relationship. King timely appealed from the adverse judgment.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to provide "a short and plain statement of [each] claim showing that [she] is entitled to relief[.]" Rule 12(b)(6) entitles a defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted[.]" Read together, Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 US 544, 555, 127 S. Ct. 1955, 1965 (2007)).

To survive a Rule 12(b)(6) motion, the plaintiff's complaint must articulate her "grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the

---

Neither this court nor any Texas court has adopted the doctrine, and the magistrate judge did not address it. Baylor still invokes the doctrine in its response, and King replies that it is inapplicable based on *Metzner v. Quinnipiac Univ.*, where the court found that the promise was not "to provide an effective or adequate education but instead to provide an in-person education." 528 F. Supp. 3d 15, 30 (D. Conn. 2021). We decline to address this doctrine in the first instance.

The parties also dispute whether the Texas Pandemic Liability Protection Act ("PLPA") bars King's claims. But the PLPA did not take effect until two months after the district court entered its final judgment. At least one court has since found that the PLPA is not "unconstitutionally retroactive" under the Texas Constitution. *Hogan v. Southern Methodist University*, No. 3:20-CV-02899, 2022 WL 954344, *7-10 (N.D. Tex. March 29, 2022). That court did not, however, consider whether it violates the Federal Constitution, which is what King argues. We decline to render an uninformed interpretation of the PLPA and leave that for the district court in the first instance.

speculative level.'" *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir 2007) (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). A complaint must therefore contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965-66). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

The reviewing court "must accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Walker v Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (2019) (quoting *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th. Cir. 1986)). But courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citation omitted). The court "must limit itself to the contents of the pleadings, including attachments thereto[,]" which in this case include publicly available information from Baylor's website. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

## III. DISCUSSION

King argues that the district court committed several critical errors. First, she contends that the FRA is not a valid and enforceable contract. Second, the district court erred by not considering her extrinsic evidence because even if the FRA is an enforceable contract, it is not fully integrated. Third, the court should not have dismissed her implied contract claim based on Baylor's promise to provide in-person educational services. Finally, King

argues that the district court erred by dismissing her unjust enrichment claim.

The district court erred in certain respects. The FRA is an enforceable contract, but the district court did not consider whether the contractual term "educational services" is ambiguous. That a contract is enforceable does not mean its terms are unambiguous. *See Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 303 S.W.3d 700, 701-02 (Tex. 2010) (*per curiam*). Indeed, questions of validity are logically distinct from questions of interpretation and construction.[5] The district court also failed meaningfully to interpret "educational services" in light of the circumstances surrounding the FRA's formation. But it did not err by dismissing King's implied contract or unjust enrichment claims. We discuss each of these issues in turn.

### A. The FRA is a valid, enforceable contract under Texas law.

The district court determined that the FRA is a valid, enforceable contract that "incorporates all of the essential and material terms of King's registration for Spring 2020 academic classes[.]" Challenging this conclusion, she insists that the FRA fails for lack of consideration. King also disagrees with the conclusion that the FRA describes "the essential terms of the agreement between [her] and Baylor[.]" And she faults the court for "selectively" and "inconsistently" incorporating external sources to elucidate certain essential terms. The FRA is not a fully integrated contract,

---

[5] For example, in the arbitration context, the Texas Supreme Court has explained that "[w]hether a valid arbitration agreement exists . . . ." and "[w]hether contractual ambiguity exists . . . ." present two separate legal questions. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (orig. proceeding) (citations omitted). And "[a]rbitration agreements are interpreted under traditional contract principles[]" by Texas courts, so these same separate inquiries are appropriate even outside of the arbitration context. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (collecting cases).

King asserts, but "a simple promissory note that was part of a larger course of dealing between the parties[.]"[6]  Acknowledging the general principle that "the relationship between a private school and its student has by definition primarily a contractual basis[,]" King contends that the contract here is implied rather than express and therefore cannot be limited to the FRA's terms alone. *Eiland v. Wolf*, 764 S.W.2d 827, 838 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (citation omitted).  None of these arguments successfully rebuts the district court's conclusion.

### i. Adequate consideration

Lack of consideration is a weak reed.[7]  King contends, for instance, that the FRA requires her to pay tuition without requiring Baylor to "provide any services in the first instance."  "[M]utuality is . . . determined when enforcement is sought, not when the promises are made." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied) (citations omitted).  Further, "[t]he modern decisional tendency is against lending the aid of courts to defeat contracts on technical grounds of want of mutuality." *Tex. Gas Util. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970) (citation omitted).  Contracts are therefore "construed in favor of mutuality[.]" *Id.* (citation omitted).  Moreover, "[t]he existence of a written contract . . . presumes consideration for its

---

[6] "In Texas, a promissory note is 'a simple contract governed by the fundamental rules applicable to contract law.'" *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (quoting *Guthrie v. Nat'l Homes Corp.*, 387 S.W.2d 158, 159 (Tex. Civ. App.—Fort Worth 1965), *judgment reformed*, 394 S.W.2d 494 (Tex. 1965)).

[7] King does not raise this argument in her complaint and only did so for the first time in her response to Baylor's motion to dismiss.  And neither the magistrate judge nor the district court addressed this argument.  We assume *arguendo* that the issue was raised and preserved.

execution[, so] [t]he party alleging lack of consideration has the burden of proof to rebut the presumption." *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App.—Tyler 2010, no pet.) (citation omitted).

King has not rebutted the presumption that the FRA is supported by adequate consideration. Baylor promised to provide King with "educational services." In exchange, King committed "to pay for all assessed tuition, fees, and other associated costs . . . ." Whatever "educational services" means, King attended both in-person and online classes and does not "claim that Baylor failed to fulfil a promise to provide an effective or adequate education." She therefore received some benefit after paying tuition and fees, and Baylor shouldered the obligation of providing services to King while benefitting from her payment. The FRA was presumptively supported by adequate consideration, and both its text and the parties' conduct support that conclusion. *See Tex. Gas Util.*, 460 S.W.2d at 412 (citation omitted).

### ii. Essential terms

The district court determined that "the FRA incorporates [by reference] the services to be rendered, the duration of such services, and the price[.]" King disagrees, and she faults the district court for selectively incorporating sources that, in her view, do not flesh out the requisite terms.

"To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)). Essential terms "are those that the parties would reasonably regard as vitally important elements of their bargain, an inquiry that depends primarily on the intent of the parties." *McCoy v. Alden Indus., Inc.*, 469 S.W.3d 716, 725 (Tex. App.—Fort Worth 2015, no pet.) (citation omitted). Though essential terms vary from contract to contract, they generally include "the time of performance, the price to be

paid, . . . and the service to be rendered." *Port Freeport v. RLB Contr. Inc.*, 369 S.W.3d 581, 590 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *Kirby Lake Dev. Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010)).

Essential terms are reasonably certain and definite when they convey both that the "parties actually intended to be contractually bound[]" and "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Fischer*, 479 S.W.3d at 237 (citation omitted); *FFSS v. Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied) (quoting Restatement (Second) of Contracts § 33(2) (1981)). "[B]ecause the law disfavors forfeitures, [courts] will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation."[8] *Fischer*, 479 S.W.3d at 239. Indeed, "Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way." *Kirby Lake Dev.*, 320 S.W.3d at 842 (quoting *Reo Indus., Inc. v. Nat. Gas Pipeline Co. of Am.*, 932 F.2d 447, 454 (5th Cir. 1991)). The presumption against forfeiture is even greater where at least one party has performed under the contract. *Fischer*, 479 S.W.3d at 242 (citations omitted).

### a. Time of performance

The district court found that the FRA covered King's education for the Spring 2020 semester because she selected that semester on BearWeb as she simultaneously submitted the FRA. But King contends that the FRA

---

[8] It is important to distinguish between contract interpretation and construction. The former "involves ascertaining the meaning of contractual words while [the latter] involves deciding their legal effect." 11 Williston on Contracts § 30.1 (4th ed. Nov. 2021 update).

must itself define the time of performance and that it fails to do so.[9]  This contention is defeated by her pleadings and Baylor's exhibits.

"A contract is not ambiguous nor too indefinite to be enforced in regards to its duration so long as the language used fixes an ascertainable fact or event by which the term of the duration of the contract can be determined."  *Brittian v. General Tel. Co.*, 533 S.W.2d 886, 891 (Tex. Civ. App.—Fort Worth 1976, writ dism'd).  To enroll, King visited a BearWeb page that displayed the entire FRA and required her to check two boxes to effectuate it.  By clicking the first box, King confirmed that she was "attending Baylor University in Spring 2020[.]"  By clicking the second box, King "agree[d] to be bound by the [FRA] for [that] term and all terms in which [she] enroll[ed] at Baylor University."  The terms attached to the boxes appeared on the same page as the FRA.  And "a customer on notice of contract terms available on the internet website is bound by those terms[.]"  *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 268 (5th Cir. 2011) (citation omitted).[10]  When King clicked both boxes to effectuate the FRA, she consented to the attached terms, including limiting her enrollment

---

[9] King maintains that the district court erred by incorporating BearWeb to specify the duration of the contract.  She further contends that if the FRA does incorporate BearWeb, then it should incorporate the portal's provisions "about classes being provided in-person and on-campus (as compared to online)."  But incorporation is not relevant at all with respect to time of performance  because those terms were depicted alongside (as opposed to referenced within) the FRA.

[10] Texas courts are in accord when presented with similar circumstances in the consumer and employment arbitration contexts.  *See Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 205-09 (Tex. 2021); *HomeAdvisor, Inc. v. Waddell*, No. 05-19-00669-CV, 2020 WL 2988565, at *5 (Tex. App.—Dallas June 4, 2020, no pet.) (mem. op.); *H.E.B. Grocery Co. L.P. v. Perez*, No. 13-18-0063-CV, 2019 WL 3331466, at *2 (Tex. App.—Corpus Christi-Edinburg July 25, 2019, no pet.) (mem. op.); *Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 155-56 (Tex. App.—San Antonio 2006, no pet.).

to the Spring 2020 semester.  The time of performance was included with a reasonable degree of certainty and definiteness.

### b. Price

The district noted that the price, i.e. her tuition and fee obligation, "was reported in King's 'My Account of Baylor's . . . E-Bill System[.]'" King argues that the separate bill does not suffice to render the FRA reasonably certain and definite as to price.

"Under Texas law, a contract may incorporate an unsigned document by reference 'provided the document signed by the defendant plainly refers to another writing.'"  *Sierra Frac Sand, L.L.C. v. CDE Glob. Ltd.*, 960 F.3d 200, 203 (5th Cir. 2020) (quoting *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)).  "No specific words are required to incorporate a document as long as the signed document plainly refers to another document." *Tex. Dep't of Pub. Safety v. Williams*, 303 S.W.3d 356, 358 (Tex. App.—El Paso 2009, no pet.) (citation omitted).  But [p]lainly referring to a document requires more than merely mentioning [it, rather] [t]he language in the signed document must show the parties intended for the other document to become part of the agreement." *Bob Montgomery Chevrolet v. Dent Zone*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) (citations omitted).  Moreover, "reference to a document for a particular purpose incorporates that document only for the specified purpose." *Id.* (citation omitted).  "When a document is incorporated into another by reference, both instruments must be read and construed together." *In re C & H News Co.*, 133 S.W.3d 642, 645-46 (Tex. App.—Corpus Christi-Edinburg 2003, no pet.) (citation omitted).

The FRA plainly refers to, and thereby incorporates, an individualized invoice that defined the price required of King with a reasonable degree of certainty and definiteness.  King made two promises by assenting to the FRA's first paragraph.  First, she promised to "pay all assessed tuition, fees,

and other associated costs . . . ." Second, she promised to pay those amounts "by the scheduled due date as reflected in emails to [her]; in the invoices, statements, and schedules within the My Account tab of Baylor's electronic billing called the E-Bill System; or in the following link: www.baylor.edu/sfs/duedates." King contends that "the FRA incorporates only the due date information from the three sources it references[.]" In other words, King maintains that the FRA incorporated the when without the what. But a due date in isolation is meaningless. What is due must be apparent before the due date becomes relevant because it is impossible to satisfy a due date without knowing what is due. Thus, even if the FRA only incorporates "due date information" from the three referenced sources, that information logically includes the amount charged for tuition, fees, and other associated costs.[11] If that were not the case, then the date alone would be meaningless, and this court must resist that result by "striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) (citation omitted).[12]

---

[11] Baylor also explains that "the price each student pays depends on the courses she chooses, additional services selected, and any outstanding credits or balances. [Thus, t]he only way the FRA could possibly specify the price to be paid is by referring to individually calculated figures in other documents."

[12] Even if the FRA did not plainly incorporate the referenced individual invoice, "the absence of a fixed total price for services does not indicate a failure of the parties to reach a meeting of the minds…." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex. 2008)(citations omitted). Assuming an otherwise binding agreement existed, courts will "presume[] that a reasonable price was intended[]." *Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex. 1966). That King later complains about the price she paid does not implicate the degree of certainty and definiteness of the price term embodied in the FRA.

### c. Services rendered

The district court determined that Baylor's promise to provide "educational services" was reasonably certain and definite. It further determined that Baylor provided "educational services" as contemplated by the FRA even after administering classes virtually. King argues that, on the contrary, the FRA insufficiently describes the services rendered because it does not include "the type, format, or subject matter of the 'educational services' to be performed, or anything else that would shed light on what Baylor was required to provide to [her]." She additionally faults the court for not "analyz[ing] what the term 'educational services' encompasses, or point[ing] to any definition or explanation of the scope of 'educational services' in either the FRA itself or any other document . . . incorporated by reference into the FRA."

For purposes of determining whether the FRA's validity and enforceability, there is no doubt that the term "educational services" is "sufficiently definite to confirm that both parties actually intended to be contractually bound." *Fischer*, 479 S.W.3d at 237 (citation omitted). To be sure, "educational services" is a broad term in isolation. But the FRA specifically uses the terms *class*, *classes*, *future classes*, *class day*, and *class schedule* a dozen times, suggesting that classes are the core of "educational services." Thus, at a minimum, Baylor bound itself to conduct classes, and King bound herself to pay for those classes in which she chose to enroll. Whether "educational services" further includes "benefits and services above and beyond basic academic instruction" is a question of contract interpretation, not validity, and the denial of such services may raise a question of breach.

The parties' conduct reinforces that they contemplated at least some educational services with a reasonable degree of certainty and definiteness.

*See Clear Creek Indep. Sch. Dist. v. Cotton Commer. USA, Inc.*, 529 S.W.3d 569, 582-85 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *see also Hous. Cmty. Coll. Sys. v. HV BTW, LP*, 589 S.W.3d 204, 213 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. a. King only seeks redress for one-half of the Spring 2020 semester, suggesting that Baylor performed as the parties agreed during the other half. And King did not challenge any aspect of Baylor's performance until nearly a month after the Spring 2020 semester concluded. By that time, she had paid Baylor and Baylor had provided a semester's worth of classes. King "does not . . . assert that classes should have been taught differently; nor does [she] claim that Baylor failed to fulfill a promise to provide an effective or adequate education." Instead, she contends "that the in-person, on-campus educational experience commands a higher price than the online-only educational experience." Whether Baylor overcharged for online classes does not, however, affect whether those classes constituted "educational services." The FRA therefore defines the services rendered, and "educational services" in particular, with a reasonable degree of certainty and definiteness.[13]

The FRA is a valid contract because it describes the essential terms with a reasonable degree of certainty and definiteness. King failed to state a claim for contract invalidity. But the crux of the parties' dispute remains the interpretation of "educational services," to which we now turn.

---

[13] King makes passing reference to the alleged inadequacy of the FRA to describe her rights and remedies with respect to services rendered. This is a ludicrous ground of alleged invalidity. The law provides rights and remedies of which she has sought to avail herself. *See Langever v. Miller,* 76 S.W. 2d 1025, 1026-27 (Tex. 1934)(collecting cases); *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 92 (Tex. 2008), *superseded by statute on other grounds*, TEX. LAB. CODE §§ 61.051(c), 61.052(b-1). And neither the magistrate judge nor the district court addressed this argument.

### B. "Educational Services" may be ambiguous but, even if unambiguous, the court must interpret it in light of the circumstances surrounding King's effectuation of the FRA.

As noted above, contract validity and interpretation inquiries are logically distinct. *See Gallagher Headquarters Ranch Dev.*, 303 S.W.3d at 701-02; *see also Progressive Cty. Mut. Ins. v. Kelley*, 284 S.W.3d 805, 806-08 (Tex. 2009); 1 ARTHUR L. CORBIN ON CONTRACTS § 4.1 (2021). Reasonably certain essential terms comprise a valid foundation while the full extent of their precise meanings further shapes the contractual edifice; competing notions of the latter do not necessarily fracture the former. At this point, the parties' competing understandings of "educational services" under the FRA required the court to assess whether the term is ambiguous and, if so, how to define it. The district court thus erred in holding that the FRA's merger clause extinguishes any "implied contract" or "promise" of in-person instruction. The merger clause is unhelpful in construing the breadth of the term "educational services."[14]

Baylor, for its part, takes the position that educational services "is a broad term that would include academic classes delivered over an online medium[]" at its sole discretion because it charges an undifferentiated price for all undergraduate course instruction. But King asserts that, even if the FRA is a valid contract, educational services is an ambiguous and incomplete term. Moreover, "[b]ecause the FRA is manifestly ambiguous," "the district court should have considered [her] extrinsic evidence allegations to fill in the FRA's gaping holes notwithstanding [its] limited merger clause."

---

[14] Put simply, "[a] merger clause can be disregarded upon pleading and proof of ambiguity[.]" *ISG State Operations, Inc. v. Nat'l. Heritage Ins. Co.,* 234 S.W 3d 711, 719-20 Tex. App.—Eastland 2007, pet. denied) (citation omitted).

There is a legitimate question, which the district court did not address, whether "educational services" is ambiguous. Moreover, even if the term is unambiguous, it ought to be interpreted in light of the context surrounding King's entry into the FRA.

### i. Latent ambiguity

Whether a contract is ambiguous is a question of law. *Sage Street Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993) (citations omitted). "A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (collecting cases). "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." *Id.* (citations omitted). Unlike construing contracts against forfeiture, the court "need not embrace strained rules of interpretation which would avoid ambiguity at all costs[.]" *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 602 (1959); *see also* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30.40 (4th ed. 1999)).

Parol evidence is admissible to elucidate latent contractual ambiguities. Latent ambiguities "arise[] when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted). If, for example, "a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on the

street, it would be latently ambiguous."[15]  *Id*. at 520 n.4.  Under such circumstances:

> extrinsic evidence of the parties' true intent will then—and only then—be admissible to settle the matter.  But, when the contextual evidence discloses no ambiguity, extrinsic evidence that the parties actually intended for the goods to be delivered to the blue house on Pecan Street would not be admissible to alter unambiguous contract language requiring delivery to the green house.  Nor would the contract's meaning be informed by extrinsic evidence that the parties intended additional requirements or constraints that were not expressed in the agreement—such as delivery by 5:00 p.m. or only on Sundays.
>
> . . . .
>
> Thus, extrinsic evidence may be consulted to give meaning to the phrase the green house on Pecan Street, but cannot be used to show the parties' motives or intentions apart from the language employed in the contract.

*URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 765-67 (Tex. 2018) (internal quotation marks and citations omitted).

The district court failed to consider whether "educational services" as used in the FRA is latently ambiguous.  Baylor contends that "[r]egardless of whether it is framed as an 'on-campus product' or an 'online product,' a course of instruction is an 'educational service,' and nothing in the [FRA] supports [King's] allegation that Baylor was contractually obligated to

---

[15] The Texas Supreme Court has also found that "[w]here . . . [a] lease contain[ed] a description of the demised premises that [was] so general that it seemingly describe[d] more than one location, [it] contain[ed] a latent ambiguity."  *Fort Worth Neuropsychiatric Hosp., Inc. v. Bee Jay Corp.*, 600 S.W.2d 763, 766 (Tex. 1980).  The parties' intent as to the number of insurance policies was also latently ambiguous where an insurer listed four vehicles on one document and a fifth on a separate document with a different policy number.  *Progressive Cty. Mut. Ins.*, 284 S.W.3d at 805-06, 808.

provide in-person instruction during the COVID-19 pandemic." King offers a conflicting understanding of educational services by alleging that she "paid for one product—an in-person, on-campus educational experience—and yet received another[]" that commands a lower price. King further alleges that she paid fees "for access to various on-campus services and facilities[]" that Baylor prevented her from enjoying. Thus, King contends, "[t]o the extent [the FRA is] a contract, Baylor breached that contract when it failed to provide the educational services that it represented it would provide and then failed to provide refunds for the educational services it failed to provide." The district court did not consider whether King's capacious interpretation of "educational services" is reasonable and, if so, whether the term is latently ambiguous. Indeed, the fact that Baylor's understanding of "educational services" is reasonable does not render King's interpretation automatically unreasonable and eliminate any ambiguity. If both understandings are reasonable, then "educational services" may be ambiguous. *See RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (citations omitted). By the same token, the mere fact that the parties disagree on the interpretation does not render the term ambiguous. *Columbia Gas,* 940 SW.2d at 589 (Tex. 1996) (citations omitted).

On remand, the district court must consider whether Baylor's or King's interpretation of "educational services" prevails. If the term is latently ambiguous, then further proceedings may be necessary to explore its meaning.

### ii. Circumstances surrounding the FRA's formation

Also on remand, the court must examine the surrounding circumstances pertinent to the making of the FRA. "In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous

21

No. 21-50352

language, . . . circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language[.]" *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (citation omitted). Surrounding circumstances include "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties." *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (quoting 11 WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999)). Phrased differently, "evidence of surrounding circumstances may 'aid the understanding of an unambiguous contract's language,' 'inform the meaning' of the language actually used, and 'provide context that elucidates the meaning of the words employed.'" *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 749 (Tex. 2020) (quoting *URI*, 543 S.W.3d at 757-59). But, irrespective of whether they actually illuminate meaning, the court must examine all parts of the contract and the surrounding circumstances to ascertain the parties' intention in making the writing."[16] *See Columbia Gas*, 940 S.W.2d at 591 (citations omitted).

The parol evidence rule, even when bolstered by a merger clause, does not prohibit consideration of "surrounding facts and circumstances that inform the contract text and render it capable of only one meaning." *Americo*

---

[16] For example, in *Americo Life, Inc. v. Myer*, the parties' arbitration agreement required arbitrators to be "independent" and incorporated rules that were later amended to require both independence and impartiality. 440 S.W.3d 18, 20-21 (Tex. 2014). One party argued that the arbitrator needed to have been independent, while the other insisted that the arbitrator must have been both independent and impartial. *Id.* at 22. The Texas Supreme Court "disagree[d] that 'independent' [could have been] read interchangeably with 'impartial[,]'" reasoning that "[v]arious dictionary definitions might support some overlap between the two words, but when applied in the arbitration context, they carry distinct meanings." *Id.* And it ultimately "conclude[d] [that] the parties did not intend to require impartiality of party-appointed arbitrators." *Id.* at 24.

*Life*, 440 S.W.3d at 22 (citations omitted).  King emphasizes a litany of Baylor's representations.  For example:

- o "The Baylor college experience is special. We cultivate a rich campus life that will help you grow intellectually, spiritually and emotionally. Whether you're enjoying Diadeloso (our campus-wide "Day of the Bear" celebration), taking some time to reflect in chapel or just hanging out over coffee, you'll feel like a part of the Baylor family from the moment you set foot on Fountain Mall[;]"

- o "Explore the picturesque Baylor Campus and learn more about our state-of-the-art facilities that blend historic beauty with innovative function[;]"

- o "Baylor is a charter member of the powerful Big 12 Conference, which means students enjoy the excitement of Division I athletics and receive free tickets to all sporting events! Not quite at that level of play yourself? No worries. Baylor also offers competitive and recreational sports for all students through club and intramural groups[;]"

- o The McLane Student Life Center is "a 156,000 sq. ft. multi-recreational facility that boasts the tallest free-standing climbing structure in Texas, an aquatics center, 3-tiered fitness facility, and four courts equipped to support basketball or volleyball[;]"

- o Baylor touts "over 330 student organizations, including academic and professional clubs, traditional Greek sororities and fraternities, honor societies, musical groups, and religious and service organizations[;]"

- o "Baylor University provides undergraduate students with a truly transformational education—one in which students develop their leadership potential, explore their faith and beliefs, increase their desire for wisdom, and prepare for service in a diverse and interconnected global society[;]"

- o "At Baylor, learning is more than just what happens in the classroom. Our students' educational experiences connect their academic and creative strengths to the surrounding world, providing experiential learning opportunities in the local community and beyond that help prepare them to become leaders who can resolve challenging problems in our state, nation, and world[;]"

- o "See what it's like to sit in a classroom and learn from Baylor's world-class faculty[;]"

- o "At Baylor, students are challenged to think beyond the classroom by actively participating in domestic and global research, engaging in study abroad opportunities, and utilizing the resources of the university to lay the groundwork for a successful future[;]" and

- o "With an average class size of just 26 students and a 13:1 student to-faculty ratio, it's easy to develop a strong working relationship with each of your instructors."

The Baylor course catalog's disclaimers and course modification statements, identified previously, are also pertinent among the representations and circumstances surrounding King's agreement to the FRA.[17]

On remand, the district court must interpret "educational services" in light of the circumstances surrounding the contract. The circumstances

---

[17] In *Dean v. Chamberlain University, LLC*, the Sixth Circuit encountered an "Enrollment Agreement" in which the university "reserve[d] the right to revise, add, or delete courses, alter the total number of class hours, suspend, cancel, or postpone a class for reasons including natural occurrences or other circumstances." No. 21-3821, 2022 WL 2168812, at *2 (6th Cir. June 16, 2022) (unpublished). That agreement, according to the court, was a fully integrated contract that "did *not* promise that [the university] would provide in-person education and clinical experience only–regardless of unforeseen circumstances." *Id.* Here, Baylor sought to retain "the right to terminate or change any and all aspects of its educational and other programs at any time without prior notice[]" in its course catalog. That catalog, unlike the agreement in *Dean*, disclaimed any pretense of being a contract; yet, its provisions may still be relevant when interpreting the FRA.

are, however, useful only to the extent they elucidate, rather than contradict or supplement, the unambiguous term.[18]   Finally, evidence outside the contract cannot be used to manufacture an ambiguity.  *Instone Travel Tech Marine & Offshore v. Int'l. Shipping Partners, Inc.,* 334 F.3d 423, 432-33 (5th Cir. 2003) (citations omitted).

## C. No implied contract.

The district court determined that "[t]he FRA contains a merger clause that extinguishes any implied contracts separate from the FRA, including any promise of in-person instruction."  King argues that the merger clause "does not even claim to extinguish all implied agreements between Baylor and Plaintiff on subjects beyond the scope of the FRA."  Further, she asserts, the limited scope of "matters" described in the FRA does not extend to explaining what "educational services" Baylor was obliged to provide.

Baylor and King cannot have a valid implied contract for the "educational services" explicitly covered by the FRA.  "If a valid express contract covering the subject matter exists there can be no recovery upon a contract implied by law."  *Black Lake Pipe Line Co. v. Union Constr. Co.,* 538 S.W.2d 80, 86 (Tex. 1976), *overruled on other grounds by Sterner v.*

---

[18] We disagree with the concurring opinion's repeated focus on the absence of a *force majeure* clause in the FRA.  Using the concurrence's phrase, that dog doesn't bark if it wasn't around.  The absence of such a clause cannot supplant or detract from interpreting what the parties actually agreed on.  The concurrence essentially opines on a contract the parties did not confect.  Additionally, the concurring opinion cites no Texas case in support of the conclusion that a contract may lack limits unless it contains a *force majeure* clause.  Second, the point of our remand to further construe "educational services" is that the term may be limited to the strict provision of knowledge or may encompass the entire "Baylor experience."  And in this connection, the FRA's multiple references to "classes" must include the course catalog in toto, both in its description of classes, its references to Baylor's ability to alter them, and equally, its disclaimer of containing a contractual promise.  This majority opinion, in sum, refuses to opine based on a clause that was not in the parties' contract.

*Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989) (citation omitted).  As noted above, "educational services" at a minimum include classes because the FRA uses variations referencing classes twelve times.  To the extent that properly admitted evidence indicates "educational services" include more than classes, those services may also be covered by the FRA.

Prior case law suggests that King may have implied contracts with Baylor regarding a number of subjects aside from those expressly covered by the FRA.  *See, e.g., Pacheco v. St. Mary's Univ.*, No. 15-cv-1131 (RCL), 2017 WL 2670758, at *9 (W.D. Tex. June 20, 2017) (citation omitted) (determining that "the university guidelines—and the Code of Conduct—likely exists as part of a contract between [the plaintiff] and [the university]."); *see also Law v. William Marsh Rice Univ.*, 123 S.W.3d 786, 793 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("the crux of [plaintiffs'] breach of contract claim [was] that [the university] breached its contractual duty by failing to provide them a fair process in its disciplinary proceedings[.]"); *Doe v. William Marsh Rice Univ.*, No. 20-cv-2985, 2021 WL 4215501, at *13 (S.D. Tex. Sept. 16, 2021) (same).  But because the FRA is a valid express contract for the provision of "educational services," King cannot assert a claim for an implied contract covering that same subject matter.

King's reliance on other decisions finding implied contracts between students and universities under Texas law is misplaced.  Texas courts hold that "where a private college or university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists."  *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1998, pet. denied) (citation omitted); *see also Villarreal v. Art Inst. of Hous.,*

No. 21-50352

*Inc.*, 20 S.W.3d 792, 797 (Tex. App.—Corpus Christi-Edinburg 2000, no pet.).   These decisions did not, however, construe express contracts resembling the FRA and are therefore inapposite.

King's reliance on decisions from other jurisdictions finding implied contracts is similarly mistaken.  She cites dozens of cases involving students seeking tuition refunds from universities in the wake of COVID-19 shutdowns.  Of these many cases, three are most representative:  *Fiore v. Univ. of Tampa*, 568 F. Supp. 3d. 350 (S.D.N.Y. 2021), *Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d. 44 (D. Del. 2021), and *Shaffer v. George Washington Univ.*, 27 F.4th 754 (D.C. Cir. Mar. 08, 2022).   But each is also distinguishable.  In *Fiore v. Univ. of Tampa*, the court applied Florida law and determined that an agreement similar to the FRA was "missing essential terms including the nature of the educational services [that the university was] to provide and the amount of tuition and fees owed."  568 F. Supp. 3d. at 371 (citations omitted).  The FRA, in contrast, contains all essential terms under Texas law, and King has not identified any university catalogs, handbooks, or policies and procedures that the court could consider as part of an implied contract.[19]   With respect to *Ninivaggi v. Univ. of Del.*, the university there never argued that a valid, express contract governed the parties' relationship.  *See* 555 F. Supp. 3d. at 47.  And in *Shaffer v. George Washington Univ.*, the court "easily" dismissed the plaintiffs' breach of

---

[19] King twice cites the course catalog.  But it disclaims any pretense of being part of any contract and is therefore of no avail.  *See Eiland*, 764 S.W.2d at 838 ("A basic requisite of a contract is an intent to be bound, and the catalog's express language negates, as a matter of law, an inference of such intent on the part of the university."); *see also Tobias v. Univ. of Tex. at Arlington*, 824 S.W.2d 201, 211 (Tex. App.—Fort Worth 1991), *cert. denied*, 506 U.S. 1049, 113 S. Ct. 966 (1993) (citations omitted).  The catalog may be instructive when interpreting the FRA and resolving any ambiguities or ascertaining surrounding circumstances, but it cannot alone form the basis of an implied contract.

express contract claims while allowing their breach of implied contract claims to proceed. 27 F.4th at 762-67. Here, however, the FRA, not an implied contract, governs King's and Baylor's relationship with respect to educational services.[20]

## D. No grounds for unjust enrichment.

King pleaded "unjust enrichment" as an alternative basis for relief in equity and seeks "disgorgement and restitution in an amount to be proven at trial[]" as remedies. The district court determined that "unjust enrichment is not an independent cause of action[,]" and that even if King sought relief pursuant to another equitable theory like *quantum meruit*, she could not recover in equity when a valid contract governs the services at issue. The district court erred in its initial statement of Texas law, but not in its rejection of unjust enrichment where the parties' contract governs the services at issue.

The district court erred by implying that unjust enrichment is a facially invalid theory. Its availability in this circumstance is narrow, but the claim exists. "Unjust enrichment occurs when a person has wrongfully

---

[20] The Seventh Circuit's decision in *Gociman v. Loyola Univ. of Chicago* is similary of limited utility. No. 21-1304, --- F.4th ----, 2022 WL 2913751 (7th Cir. July 25, 2022). There, the majority held that students stated "a claim for breach of an implied contract under Illinois law, and [that they were] entitled leave to amend to save their alternative claim for unjust enrichment[.]" *Id.* at *1. In reaching that conclusion, the majority determined that the students had no express contract with the university and instead reasoned that the university's course catalog, registration portal, pre-pandemic practice, and variable tuition rates (based on the method of instruction) constituted an implied promise to provide in-person classes to those who paid the in-person rates. *Id.* at *6-7. The dissent, however, concluded that "[n]one of the written materials the students cite[d] contain[ed] a specific guarantee of in-person education or amenity access sufficient to maintain an implied contract under Illinois law." *Id.* at *10-12. We need not take sides because King has an *express* contract with Baylor under Texas law, and any parol evidence is only relevant to construe its meaning rather than to add terms.

secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citation omitted). It essentially "characterizes the result or failure to make restitution of benefits received under such circumstances as to give rise to an implied or quasi-contract to repay." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g) (citation omitted). But "unjust enrichment does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.) (citation omitted).

King asserted unjust enrichment as "Count II" in her amended complaint, and many Texas courts have recognized it as a valid alternative basis for equitable relief when pled in that manner.[21] "A party to a contract may . . . seek alternative relief under both contract and quasi-contract theories[]" like unjust enrichment. *In re Kellogg Brown & Root Inc.*, 166 S.W.3d 732, 740 (Tex.2005). But, "[g]enerally speaking, when a valid,

---

[21] "Although several Texas courts of appeals hold that there is no such cause of action, the Texas Supreme Court has suggested otherwise." Michol O'Connor, O'Connor's Texas Causes of Action, Ch. 5-C § 7 (2022) (*comparing Elledge v. Friberg-Cooper Water Sup.*, 240 S.W.3d 869, 870 (Tex. 2007) (reaffirming two-year limitations period for unjust enrichment claims), *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001) (discussing limitations period for unjust enrichment claims), *Fortune Prod. v. Conoco, Inc.*, 52 S.W.3d 671, 685 (Tex. 2000) (referring to unjust enrichment cause of action), *and HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885, 891 (Tex. 1998) (referring to unjust enrichment cause of action and two-year limitations period), *with Spellmann v. Love*, 534 S.W.3d 685, 693 (Tex. App.—Corpus Christi-Edinburg 2017, pet. denied) (unjust enrichment is not independent cause of action), *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App.—Waco 2008, pet. denied) (same)).

express contract covers the subject matter of the parties' dispute, there can be no recovery under [such] a quasi-contract theory[.]" *Fortune Prod Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (citation omitted).

Texas courts have repeatedly expressed this limit. Once a court determines that a "valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648-49 (Tex. 2007). In other words, when "the contract addresses the matter at issue, [the party invoking equity] is limited to the contract rather than equity when determining liability."[22] *Gotham Ins. Co. v. Warren E & P, Inc.*, 455 S.W.3d 558, 563 (citing *Fortis Benefits*, 234 S.W.3d at 648-49). That is why the Texas Supreme Court pithily paraphrased its decision in *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000), as "holding unjust enrichment inapplicable when parties have an express contract covering the subject matter of the parties' dispute[.]" *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005).

Texas intermediate appellate court decisions' reflect this limit as well. For example, in *ConocoPhillips Co. v. Koopmann*, "the trial court correctly dismissed the [non-participating royalty interest holders'] unjust

---

[22] In *Gotham*, the Texas Supreme Court declined to condone dismissal of the plaintiff's equity claims at summary judgment because the plaintiff "that [a defendant's] misrepresentations concerning its working interest could, among other remedies, operate to render the policy void." 455 S.W.3d at 563 n.11. If the misrepresentation theory prevailed *and* the plaintiff elected to void the policy, only then could it possibly recover in equity. *Id*. That possibility was therefore predicated on the absence of a valid contract.

King, by contrast, has raised no misrepresentation theory or any other theory that would permit her to void her contractual relationship with Baylor. The possibility that she may not *recover* under the contract is not akin to her potentially voiding it. That distinction is critical.

enrichment claim against [the mineral lessee's parent company] as a matter of law because a valid lease cover[ed] the subject matter of th[at] dispute." 542 S.W.3d 643, 666-67 (Tex. App.—Corpus Christi-Edinburg 2016), *aff'd on other grounds*, 547 S.W.3d 858 (Tex. 2018). Similarly, in *Double Diamond, Inc. v. Hilco Elec. Co-op., Inc.*, "[t]he dispute between [the parties was] one concerning failure to pay under a contract, the terms of which [were] in dispute." 127 S.W.3d 260, 268 (Tex. App.—Waco 2003, no pet.). And the court held that "summary judgment on the basis of quantum meruit would be improper[]" because "[t]f the delivery of services and materials, and payment for them, are governed by a valid contract, the action sounds in contract, not *quantum meruit*." *Id.* (collecting cases). Yet another Texas intermediate appellate court acknowledged that it was "unable to locate *any case* in which an unjust enrichment remedy was allowed when the contested issue was governed by a valid contract." *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 98 (Tex. App.—Texarkana 1996), *aff'd sub nom. Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998) (emphasis added).

The only conclusion that can be drawn from these authorities is that although King could plead unjust enrichment as an alternative basis of recovery, the terms of the FRA form the basis for the issues she raises. The FRA is a valid express contract that covered Baylor's provision of "educational services" during the Spring 2020 semester, which is what this entire dispute is about. And the ultimate interpretation of "educational services" will not affect the FRA's validity.[23] King's appeal to equity is

---

[23] Some disputes involve both legal claims and equitable theories proceeding to trial because the defendant did not seek to dispose of those claims. For example, in *Houston Med. Testing Serv., Inc. v. Mintzer*, "[t]he trial court's charge asked the jury to determine [the defendant's] personal liability for both breach of contract and quantum meruit." 417 S.W.3d 691, 694 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (Busby, J.). There

No. 21-50352

barred by her pursuit of available legal remedies under the FRA.[24]  *See Gotham*, 455 S.W.3d 558, 563 (citing *Fortis Benefits*, 234 S.W.3d at 648-49); *see also BMG*, 178 S.W.3d at 770 (citing *Fortune*, 52 S.W.3d at 684).

## IV. CONCLUSION

For the reasons stated above, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.

---

is no mention of any motions to dismiss or for summary judgment.  "The jury found in Question 1 that the parties had an agreement with regard to the . . . services [at issue.]"  *Id.* at 696.  "Because a contract covered the services at issue, the [appellate court held that the plaintiff] [could] not recover in quantum meruit.  Instead, the contract define[d] the [plaintiff's] s rights.  *Id.*  Again, the dual theories of recovery apparently only reached the jury due to inaction, not by judicial sanction.  Baylor, unlike defendants in other cases, contests the dual theories of recovery, and the court must respond accordingly.

[24] "[O]verpayments under a valid contract may give rise to a claim for restitution or unjust enrichment."  *Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 204 (5th Cir. 2015) (quoting *Sw. Elec. Power*, 966 S.W.2d at 469-470).  But most cases involving overpayments under valid contracts feature parties asserting equitable claims *instead* of breach of contract claims.  *See, e.g.*, *Sw. Elec. Power*, 966 S.W.2d at 469-470; *Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28, 29-33 (5th Cir. 1963); *Natural Gas Pipeline Co. v. Harrington*, 246 F.2d 915, 916-19, 921 (5th Cir. 1957); *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951).  King's pursuit of both legal and equitable relief renders these cases inapt.  *See BMG*, 178 S.W.3d at 770 (collecting cases).

No. 21-50352

Stuart Kyle Duncan, *Circuit Judge*, concurring:

Baylor responded to covid-19 by turning itself into an online university. Maybe that decision was wise. Maybe it was unavoidable. Regardless, it has provoked the legal question in this case: did Baylor breach its contracts with students by going online? The plaintiff, Allison King, claims Baylor unilaterally changed her bargain with the school. She paid for classes on a physical campus in real classrooms before flesh-and-blood teachers. She wouldn't have paid as much for zoom classes in the cloud. Maybe Baylor has ironclad defenses to these claims, but we aren't there yet. We're only at the motion to dismiss phase where King's allegations are taken as true. And she alleges a straightforward breach-of-contract claim: I paid for something, you changed the deal to give me something worth less, and I want some money back. Many courts around the country, faced with similar allegations, have refused to dismiss them.[1]

Yet the district court threw King's claims out. Why? It thought Baylor never agreed to provide "in-person instruction" and "expressly" reserved an absolute right to alter class offerings in response to catastrophes like a pandemic. Nonsense. Baylor could have written contracts with those escape hatches, but it didn't. No contract Baylor points to says anything of the sort. So, the majority correctly reverses and remands.

---

[1] *See, e.g.*, *Gociman v. Loyola Univ. of Chicago*, --- F.4th ----, No. 21-1304, 2022 WL 2913751 (7th Cir. July 25, 2022); *Shaffer v. George Washington Univ.*, 27 F.4th 754, 765 (D.C. Cir. 2022); *Ninivaggi v. Univ. of Delaware*, 555 F. Supp. 3d 44, 52 (D. Del. 2021); *Fiore v. Univ. of Tampa*, 568 F. Supp. 3d 350, 369 (S.D.N.Y. 2021); *Patel v. Univ. of Vermont & State Agric. Coll.*, 526 F. Supp. 3d 3, 20 (D. Vt. 2021); *In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346, 1353 (S.D. Fla. 2021); *Student A v. Liberty Univ., Inc.*, --- F.Supp.3d ----, No. 6:20-CV-00023, 2022 WL 1423617, at *5 (W.D. Va. May 5, 2022); *Miranda v. Xavier Univ.*, --- F.Supp.3d ----, No. 1:20-CV-539, 2022 WL 899668, at *6 (S.D. Ohio Mar. 28, 2022).

No. 21-50352

I agree with that result. I write separately to explain why the district court erred and to lay out what contract principles, in my view, should govern the proceedings on remand.

I.

First, the district court's rationale for dismissing King's claim was mistaken. It is worth explaining why so that such errors do not infect the proceedings going forward.

According to the district court,[2] the FRA's merger clause "extinguishes" any implied promise of "in-person instruction," and "expressly contemplates that any number of Jumanjian[3] phenomena may require Baylor to alter its anticipated methods in order to continue providing 'educational services.'" So, that clause "expressly" secures Baylor's right to unilaterally respond to "catastrophic ex[i]gencies," like a "flood," "tornado," or the "Spanish influenza." This is "clear and unambiguous," we are told, and "absent language regarding the mode of instruction in the express terms of the instrument, King's objection to remote instruction merely reflects a preference that does not give rise to a claim."

That is all wrong. The merger clause doesn't breathe a word giving Baylor *carte blanche* to change how it offers courses. It says nothing about floods, tornadoes, diseases, or other catastrophes. It doesn't contain *force majeure* or "act of God" language.[4] So, it's not true that "the merger clause

---

[2] The court adopted the magistrate judge's report and recommendation.

[3] As my children could tell you, "Jumanjian" refers to movie adaptations of a board game (the first starring Robin Williams, the second starring Jack Black) in which zany and unexpected things happen to pedestrian characters transported into a video game.

[4] *See, e.g.*, *El Paso Marketing, L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 140 n.6 (Tex. 2012) (discussing *force majeure* clause); *Guillory Farms, Inc. v. Amigos Canning Co., Inc.*, 966 S.W.2d 830, 837 (Tex. App.—Beaumont 1998, rev. denied) ("A typical *force*

expressly contemplates" Baylor's absolute right to alter course delivery in an emergency. The clause thus provides no basis for dismissing as a matter of law King's claim that Baylor breached its contract by going online.

The majority agrees the district court misread the merger clause, *ante* at 19, and adds that "[t]he merger clause is unhelpful in construing the breadth of the term 'educational services.'" *Ibid.* If the majority means the clause does not define "educational services," I agree. I would add, though, that what is *missing* from the clause may well be relevant to assessing Baylor's obligations under the FRA on remand. As I've explained, the merger clause says nothing suggesting Baylor can unilaterally go online in the event of a pandemic or other emergency. The FRA has no *force majeure* clause and courts can't blue-pencil one in. Courts in similar cases have relied on the absence of such reservation language in denying motions to dismiss.[5] Nothing bars King from pressing that argument on remand. *See infra.*[6]

---

*majeure* clause speaks of acts of God or unforeseeable powerful forces causing prevention of performance of the contract.").

[5] *See Shaffer*, 27 F.4th at 765 ("But the reservation language does not specifically address emergencies or other *force majeure* events. In particular, it says nothing about allocating the financial risk of those events to the students, as the Universities contend."); *Ninivaggi*, 555 F. Supp. 3d at 52 ("No provision expressly reserves the school's right to go online or expressly limits students' remedies. Nor is there any *force majeure* clause."); *and cf. Lindner v. Occidental Coll.*, 2020 WL 7350212, at *8 (C.D. Cal. Dec. 11, 2020) (contract claim failed in part due to express reservation of school's right to make changes required by "economic conditions or national emergency"); *Dean v. Chamberlain Univ., LLC*, No. 21-3821, 2022 WL 2168812, at *2 (6th Cir. June 16, 2022) (unpublished) (affirming dismissal where enrollment agreement reserved to university the right to "revise, add, or delete courses . . . for reasons" including "natural occurrences or other circumstances").

[6] Baylor makes two arguments that it reserved the right to alter its delivery method of "educational services," but both fail. The first is that if King may rely on extrinsic evidence such as the course catalog, then Baylor may rely on the catalog's general reservation. But, as the majority recognizes, the course catalog provisions explicitly "do not constitute a contract, expressed or implied." *Ante* at 2. Second, Baylor argues that

No. 21-50352

## II.

The majority reverses and remands because the district court failed to consider whether the FRA's term "educational services" is ambiguous. *Ante* at 1–2, 21. Fair enough: King's back-up argument was that the FRA was "incomplete and ambiguous," specifically the scope of "educational services." Blue Br. at 22, 24.[7] The majority also instructs the district court to construe that term "in light of the circumstances surrounding King's effectuation of the FRA," even if the term is unambiguous. *Ante* at 18, 22–25. I agree the case should be remanded on both grounds. In my view, the following principles should govern the analysis on remand.

### A.

"absent an express promise not to modify its course offerings, a university is free to change its 'policies and requirements.'" Red Br. at 37–38 (citing *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1998, pet. denied)). Baylor cites no authority supporting that argument. *Southwell* doesn't come close. Baylor overreads *Southwell*'s modest statement of academic freedom, which had to do with academic standards, not wholesale alterations from in-person to online instruction.

[7] King spends most of her briefing contending the FRA isn't a contract at all because it lacks essential terms. The majority correctly rejects those arguments. *Ante* at 10–18. Given its conclusion that the FRA is a valid contract for "educational services," the majority also correctly dismisses King's argument that she had an "implied contract" with Baylor for "in-person classes." *Id.* at 25–26. As the majority points out, "[i]f a valid express contract covering the subject matter exists there can be no recovery upon a contract implied by law." *Ibid.* (quoting *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex. 1976), *overruled on other grounds by Sterner v. Marathon Oil. Co.*, 767 S.W.2d 686 (Tex. 1989) (citation omitted)); *see also, e.g.*, *Woodard v. Sw. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964); *Houston Med. Testing Servs. v. Mintzer*, 417 S.W.3d 691, 695 (Tex. App.—Houston [14th Dist.] 2013, no pet.). I also agree with the majority's holding that King's unjust enrichment claim, while a facially valid theory, is nonetheless foreclosed because the FRA covers the matter at issue. *Ante* at 29–33.

First, in assessing whether "educational services" is ambiguous, the key question is whether that "contract language is susceptible to more than one reasonable interpretation." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 765 (Tex. 2018) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). Parties often disagree about what a contract's terms mean, but that doesn't make the contract ambiguous. As the majority points out, a contract is ambiguous only if both parties offer a "reasonable" understanding of disputed language, such that a court may consider extrinsic evidence to determine the parties' intent. *Ante* at 22 (citing *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)); *see also URI*, 543 S.W.3d at 764–65. On the other hand, "[i]f only one party's construction is reasonable, the [contract] is unambiguous and we will adopt that party's construction." *RSUI*, 466 S.W.3d at 118 (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 459 (Tex. 1997)).

Without deciding the issue, the majority suggests both parties may have reasonable-but-conflicting views of what "educational services" covers. *Ante* at 21–22. Baylor, the majority states, sees it as a "broad term" that embraces "online" and "on-campus" classes, with the upshot being that Baylor could honor the FRA by delivering either kind of instruction "at its sole discretion." *Ante* at 19, 21. King, by contrast, reads the term to mean the specific "in-person" and "on-campus" classes and services she agreed to pay for. *Ante* at 21. When Baylor shifted online, it "failed to provide the educational services that it represented it would provide" and then failed to reimburse her for the services she did not receive. *Ibid.*

As I read its opinion, the majority does not decide whether the parties' conflicting interpretations are *both* reasonable. That is as it should be. The threshold question of ambiguity falls to the district court on remand. Importantly, in doing so the court should "consider[] extrinsic evidence of

the facts and circumstances surrounding the contract's execution as 'an aid in the construction of the contract's language.'" *URI*, 543 S.W.3d at 765 (quoting *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). This means that the question is *not* (as Baylor argues) whether the term "educational services" embraces both on-campus and online instruction in the abstract. The inquiry is more concrete. *See ibid.* (ambiguity asks whether terms "can be given a definite or certain legal meaning . . . *as applied to the matter in dispute*") (emphasis added). Properly stated, the question is whether, given the circumstances of this contract, Baylor's agreement to provide "educational services" allowed it to shift from on-campus to online instruction "at its sole discretion" in the event of an emergency. *Ante* at 19.

One final point. In my view, the surrounding circumstances include the fact that the FRA contains no *force majeure* clause or similar reservation. *See Shaffer v. George Washington Univ.*, 27 F.4th 754, 765 (D.C. Cir. 2022); *Ninivaggi v. Univ. of Delaware*, 555 F. Supp. 3d 44, 52 (D. Del. 2021) (discussing lack of *force majeure* clauses). As noted, Baylor could have written such a clause into its contracts but did not. That raises a daunting question for Baylor on remand. How it is "reasonable" to interpret the FRA as giving by implication what an excluded *force majeure* clause would have expressly given—*i.e.*, a unilateral right to shift courses and activities online? Without a convincing answer, the contract could not be considered ambiguous and King's interpretation of the FRA should prevail. *RSUI*, 466 S.W.3d at 118.

B.

Second, the majority instructs the district court to interpret the term "educational services"—even if unambiguous—in light of the "circumstances surrounding the formation of [the] contract." *Ante* at 22 (quoting *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017)). I agree. Even if the court were to decide that "educational services" unambiguously

includes online courses and activities, King could still prevail by showing that, under the particular circumstances, she plausibly contracted with Baylor for on-campus services only.

"[E]vidence of surrounding circumstances may aid the understanding of an unambiguous contract's language, inform the meaning of the language actually used, and provide context that elucidates the meaning of the words employed." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 749 (Tex. 2020) ((quoting *URI*, 543 S.W.3d at 757–59 (and collecting authorities)).[8] Illuminating circumstances include "the commercial or other setting in which the contract was negotiated," "trade custom," "trade usage," as well as "[f]acts attending the execution" of the contract." *See URI*, 543 S.W.3d at 767–68. On remand, the district court should consider whether King has plausibly alleged that these kinds of circumstances show she contracted with Baylor for on-campus classes and activities.

For example, King's operative complaint relies on "the circumstances surrounding [the contract's] formation, including the parties' communications, conduct, and course of dealing," to allege that her bargain with Baylor encompassed "an entirely on-campus experience," including "face-to-face academic instruction." Specifically, she points to Baylor's "website and recruitment brochures," which distinguish on-campus from online programs and price them differently. She also points to the registration process, which "specifically emphasizes the distinction between [Baylor's] in-person and online class offerings," the "BearWeb portal . . . [which]

---

[8] *See also, e.g.*, *URI*, 543 S.W.3d at 767 (evidence of "circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language"); *Brumitt*, 519 S.W.3d at 110 ("If a court concludes that the parties' contract is unambiguous, it may still consider the surrounding facts and circumstances, but simply as an aid in the construction of the contract's language.") (cleaned up).

filter[s] between online only and all classes," and the "registration portal," which differentiates "in-person classes . . . by meeting time and physical classroom location."[9] And she alleges that, "when registering for classes, students are specifically advised and aware of the instructional medium of the classes for which they are registering," including whether classes are "in-person" and offered in a "physical classroom."[10]

Furthermore, King alleges that she agreed to pay for the designated in-person classes and activities "when [she] paid the monies due and owing for the Spring 2020 semester." Baylor didn't keep its end of the bargain, though: "Baylor failed to provide the agreed-upon on-campus classes and services for which the tuition, Fees, and meal plan payments were paid for the entire Spring 2020 semester." Finally, King also alleges that no contractual term allows Baylor to alter the bargain because of covid-19: "the relevant contracts provide no such terms excusing performance given nationwide pandemics."

King's principal theory, of course, is that the FRA is not a valid contract at all—a theory the majority correctly rejects. But in the alternative ("to the extent the [FRA] could be interpreted as a contract"), King pleads that Baylor breached the FRA "when it failed to provide the educational

---

[9] Her allegations also encompass the parties' course of dealing. For instance, she discusses "the parties' prior course of conduct," in which "students attended physical classrooms to receive in-person instruction" and "most students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements."

[10] She makes similar allegations with respect to fees and meal plans. For instance, she alleges that "Baylor does not charge the 'general student fee' to its students enrolled in the online program," that "Baylor refused to refund the pro-rated portion of the general student fee," and that she is "entitled to refund[]" of the "meal plan and dining dollar payments."

services that it represented it would provide and then failed to provide refunds for the educational services it failed to provide." On remand, the district court should consider whether, in light of the circumstances surrounding the contract's formation, King's alternative theory validly states a breach of contract claim based on the FRA and Baylor's promise to provide "educational services" in exchange for King's payment of tuition and fees.

One last thing. The district court suggested that the FRA's incorporation of extra-contractual sources to flesh out "educational services" weighs against King's claim. I disagree. The court referenced "three sources"—(1) email correspondence, (2) My Account invoices, statements, and schedules, and (3) Baylor's online payment schedule. But none of those sources suggests "educational services" is so open-ended that Baylor may go online without breaching the FRA. To the contrary, those sources show the "educational services" bargained for in the FRA may well be *in-person* classes and activities on Baylor's physical campus. Baylor's own evidence supports that conclusion. The affidavit attached to Baylor's motion to dismiss shows that a student may register for specific classes which are then listed on a "schedule" that specifies physical locations ("Old Main 274," "Morrison Hall 110," "Brooks College CHAPEL") all on the "Main Campus." Such "details about the course's campus location" support "a reasonable inference of in-person instruction." *Gociman*, 2022 WL 2913751, at *6. So, to the extent these sources can elucidate the meaning of the FRA, they may show the parties plausibly bargained for "educational services" that are on-campus. By contrast, the district court pointed to no incorporated source suggesting the parties left it up to Baylor's discretion whether to provide the paid-for services in-person or online.

\* \* \*

No. 21-50352

In sum, I respectfully concur in the majority's decision that the district court erred by dismissing King's breach-of-contract claim. On remand, King should have the opportunity to explain why, consistent with settled Texas law, she has plausibly alleged that Baylor breached its contract with her by converting to online instruction. Baylor, of course, can raise any valid affirmative defenses at the appropriate time.