# Supreme Court of Texas

## No. 23-0565

Luke Hogan, on Behalf of Himself and Other Individuals
Similarly Situated,

*Appellant*,

v.

Southern Methodist University, and Other Affiliated Entities and
Individuals,

*Appellees*

On Certified Question from the United States
Court of Appeals for the Fifth Circuit

**Argued October 26, 2023**

JUSTICE BLACKLOCK delivered the opinion of the Court.

In the spring of 2020, Luke Hogan was in his final semester of graduate school at Southern Methodist University. Unfortunately, like all of us, Hogan's expectations for that spring were dashed by the coronavirus and the government's response to it. Just like thousands of other schools across the country, SMU cancelled in-person classes and closed its campus at the government's insistence. Just like millions of other students across the country—from PhD candidates to

preschoolers—Hogan and his classmates were given the unsatisfying option of completing the semester on the internet. Unlike millions of other students, Hogan took his school to court.

Hogan, quite understandably, felt he had been robbed of valuable time and experience in the classroom and on the campus at SMU, time and experience for which he paid tuition.[1] He completed his classes online and received his degree, but he was unable to do so in the enlivening in-person environment that both he and SMU had anticipated would be available. In a word, he felt cheated. Millions of other students had the very same feeling. That feeling—of having been cheated during the spring of 2020—was a perfectly natural response to a world turned upside down, particularly for young people who were denied many eagerly anticipated social and educational experiences. The feeling was shared by millions of other Americans in all walks of life. But who or what cheated Hogan and his classmates? Was it SMU, which complied with government lockdown orders? Was it the government, which ordered the closures? Was it the virus itself?

Asking who or what is to blame for the closure of SMU and other schools in the spring of 2020 gives rise to related questions of enormous political, social, and economic significance. How can our society allocate responsibility for the diffuse harm suffered by Hogan and millions of young people like him who had their educations curtailed during the lockdowns? Indeed, how can we make recompense for the many other,

---

[1] Hogan paid roughly $25,000 in tuition and $3,180 in fees for the spring 2020 semester. After moving classes online, SMU did not refund any of these amounts. It did provide partial refunds for housing and meals, which are not at issue.

far greater hardships endured during the lockdowns—such as the loss of a family's livelihood or the inability to spend time with dying loved ones? How do we balance our responsibility to acknowledge these injuries with the fact that the lockdowns, at the time, were perceived by many to be a necessary response to a deadly virus?

We must acknowledge that Hogan and his classmates—along with millions of other students—were denied valuable education and experience because of the extraordinary circumstances of the spring of 2020. But who do we, as a society, hold responsible for that injury, if anyone? And what personalized recourse, if any, can we afford to individual claimants for the various harms that *everyone* suffered, in one way or another, under the difficult circumstances we endured during the most notorious year in recent memory?

These are questions of enormous consequence. Answering them requires balancing competing values and sorting through competing interpretations of the historic events of 2020. These questions were not, and hardly could have been, anticipated before the spring of 2020. The world, as we knew it, had been broken. The question the Texas Legislature confronted a year later, in the spring of 2021—a question we continue to confront today—was how to responsibly and constructively pick up the pieces. The Legislature is the branch of government uniquely suited to resolve emerging questions of vast social and economic significance on behalf of the People of Texas, and the Legislature provided at least a partial answer to these novel questions

3

in the spring of 2021. That answer was the Pandemic Liability Protection Act, which the Governor signed on June 14, 2021.[2]

Among other provisions, the PLPA protects schools from monetary liability for altering their activities in response to the pandemic. In this way, using the legislative process provided by our constitution, we as a society through our elected representatives answered some of the novel legal questions raised by the coronavirus crisis and its aftermath. We answered, as relevant here, that schools like SMU which cancelled classes in compliance with government orders will not be monetarily liable to individual students like Hogan.

Hogan now contends that the Texas Legislature lacked the authority to answer the question as it did. In his view, article I, section 16 of the Texas Constitution prohibits the Legislature from retroactively withdrawing his right to hold SMU liable for breaking its promise of in-person education. Article I, section 16 prohibits "retroactive law[s]," and Hogan contends that the PLPA's withdrawal of his pre-existing right to pursue contract remedies against SMU runs afoul of this prohibition. A federal district court sided with SMU. 595 F. Supp. 3d 559, 572 (N.D. Tex. 2022). After Hogan appealed, the Fifth Circuit certified the following question:

> Does the application of the Pandemic Liability Protection
> Act to Hogan's breach-of-contract claim violate the

---

[2] Act of May 24, 2021, 87th Leg., R.S., ch. 528, 2021 Tex. Gen. Laws 1058–64 (codified at TEX. CIV. PRAC. & REM. CODE §§ 148.001–.005).

4

retroactivity clause in article I, section 16 of the Texas Constitution?

74 F.4th 371, 378 (5th Cir. 2023).[3] As explained below, the answer to the certified question is No.

## I.

The PLPA provides, in relevant part:

> An educational institution is not liable for damages or equitable monetary relief arising from a cancellation or modification of a course, program, or activity of the institution if the cancellation or modification arose during a pandemic emergency and was caused, in whole or in part, by the emergency.

TEX. CIV. PRAC. & REM. CODE § 148.004(b).

If the PLPA governs Hogan's claims for monetary relief, there is no question those claims must be dismissed. Hogan does not dispute this. Instead, he contends that applying the PLPA to his claims would violate the Texas Constitution's prohibition on "retroactive law[s]." *See* TEX. CONST. art. I, § 16. To decide whether he is right, we first consider the text and history of our constitution's retroactivity bar, and we then consider the history of this Court's cases interpreting it.

---

[3] The parties have clashed on several other issues in federal court, including whether Hogan had an enforceable contract with SMU for in-person education. The federal courts have addressed these questions of Texas law themselves, as is always their prerogative. *See* 595 F. Supp. 3d at 563–66 (rejecting Hogan's breach-of-contract claim on the ground that SMU made no promise of in-person education); 74 F.4th at 375 (reversing dismissal of Hogan's claim because SMU's student agreement may be an enforceable promise of in-person education (citing *King v. Baylor Univ.*, 46 F.4th 344, 363 (5th Cir. 2022))). The Fifth Circuit seeks our input only as to the article I, section 16 question, and we confine our answer accordingly.

5

## A.

Some version of a prohibition on retroactive laws has appeared in the Texas Constitution since our independence from Mexico.[4] Today's version, which has not changed since its ratification in 1876, states: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. I, § 16. Notably, the previous version of article I, section 16—found in article I, section 14 of the 1869 Constitution—contained the very same language but also said quite a bit more. The 1869 version provided:

> No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made; and no person's property shall be taken or applied to public use without just compensation being made, unless by the consent of such person; *nor shall any law be passed depriving a party of any remedy for the enforcement of a contract, which existed when the contract was made.*

TEX. CONST. OF 1869, art. I, § 14 (emphasis added).

The clause of the 1869 Constitution italicized above, were it still in effect today, would appear to resolve the question before us

---

[4] TEX. CONST. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."); TEX. CONST. OF 1869, art. I, § 14 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made; . . . nor shall any law be passed depriving a party of any remedy for the enforcement of a contract, which existed when the contract was made."); TEX. CONST. OF 1866, art. I, § 14 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made . . . ."); TEX. CONST. OF 1861, art. I, § 14 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made . . . ."); TEX. CONST. OF 1845, art. I, § 14 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligations of contracts, shall be made . . . ."); REPUB. TEX. CONST. OF 1836, DEC. OF RIGHTS § 16 ("No retrospective or ex-post facto law, or laws impairing the obligation of contracts, shall be made.").

6

definitively in Hogan's favor. Between 1869 and 1876, the Texas Constitution contained this explicit ban on laws "depriving a party of any remedy for the enforcement of a contract, which existed when the contract was made." *Id*. Hogan claims he has been deprived of just such a remedy—indeed of all remedies. This language was removed, however, at the 1875 convention, and the eminent domain clause was moved to article I, section 17. The remainder of what is now article I, section 16 was ratified in 1876 and remains to this day.

The 1869 Constitution thus granted in explicit terms the specific protection Hogan argues we should find contained within the 1876 Constitution's general prohibition on retroactive laws. Hogan asserts a right to pursue the contractual remedies against SMU that were available to him when the contract was made or, in the alternative, when he filed suit. Such a right—against later legislative adjustment of the judicial remedies available to contracting parties—is plainly stated in the text of the 1869 Constitution. But we are not governed by the 1869 Constitution. We are governed by the 1876 Constitution, as amended over the years, and today's constitution omits its predecessor's specific protection for contractual remedies. What can we make of the decision by the framers of the 1876 Constitution to omit this language? What would those who ratified the 1876 Constitution have understood this textual change to accomplish? *See In re Abbott*, 628 S.W.3d 288, 296 (Tex. 2021) ("[W]e strive to interpret the Texas Constitution based on the plain meaning of the text as it was understood by those who ratified it.").

7

None of the briefing submitted by the parties or amici addresses the strikingly relevant language in the 1869 Constitution or the historical reasons for its omission from today's constitution. In the absence of historical guidance, we hesitate to assign definitive import to the removal of this language from the 1876 Constitution. Yet certainly one very natural explanation for the removal of a constitutional right between one version of the document and the next is that the framers and ratifiers of the later constitution decided the right should no longer be constitutionally guaranteed.

On the other hand, it is at least conceivable that the specific protection for contractual remedies was removed in 1876 because it was considered superfluous given the longstanding protection against retroactive laws. It is also possible that removing an explicit bar on the deprivation of *any* remedy left in place a separate bar on the deprivation of *all* remedies. Without more historical insight into what drove the insertion of this clause in 1869 and its removal in 1876, we must be careful not to draw firm conclusions about its effect on a proper interpretation of the current version of article I, section 16. It surely bears noting, however, that the precise right Hogan now asserts used to be very plainly stated in the Texas Constitution but today is not.

**B.**

What remains in the Texas Constitution is an unexplained prohibition on "retroactive law[s]." TEX. CONST. art. I, § 16.[5] Over the

---

[5] Article I, section 16 also prohibits "any law impairing the obligation of contracts." The Fifth Circuit does not ask about this provision, nor do the parties address it. We therefore make no comment on it.

8

years, this Court's varied precedents on retroactivity came to resemble a tangled wad of Christmas lights pulled from the attic after Thanksgiving. *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 138–45 (Tex. 2010) (detailing the conflicting history of Texas jurisprudence on retroactive laws). *Robinson* is required reading for anyone who wishes to understand Texas's complex jurisprudential history in this area. It describes over 150 years of case law in vivid detail. *Id.* Although we need not repeat all of that history here, *Robinson*'s exhaustive elaboration of the history is an essential resource for any court asked to apply the Texas Constitution's ban on retroactive laws.

After describing the tangled jurisprudential history, *Robinson* announces a three-part inquiry to aid courts applying the retroactivity bar. *Id.* at 145. The parties focus much attention on that inquiry, and we return to it below. But just as with a tangled string of Christmas lights, often the best way to begin is by finding where the string starts. As *Robinson* indicates, that starting point is *DeCordova v. City of Galveston*, a case decided in 1849, shortly after Texas joined the Union. *See* 4 Tex. 470, 474–80 (1849) (construing the prohibition on "retrospective laws" in article 16 of the Declaration of Rights in the 1836 Constitution of the Republic of Texas).

Before assessing *DeCordova*, however, we note the apparent simplicity of the constitutional text the case law interprets. Faced with an unexplained constitutional prohibition on "retroactive laws," it might be tempting to simply open a dictionary—one from the time of ratification, of course—and say that any law that fits within the

9

definition of "retroactive" is unconstitutional. Hogan would surely benefit from such an approach. But again, our bottom-line task is to identify what the constitutional provision would have meant to those who ratified it. *In re Abbott*, 628 S.W.3d at 296. Plain-language analysis and contemporary dictionary definitions are certainly very useful ways to understand the original meaning of constitutional text. But if jurisprudential history indicates that a legal term of art, such as "retroactive law," was understood at the time of ratification to contain subtleties or complexities beyond what a dictionary of common usage conveys, then naturally we must consider the history as well as the text in order to understand the constitution's original meaning.

As with any legal text, both the text and the context in which it appears can be important indicators of meaning. Here, the words may appear simple—"retroactive law"—but their context is a constitutional provision incorporating a hoary legal concept with a complicated history dating at least to classical antiquity. *See Robinson*, 335 S.W.3d at 136 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855–56 (1990) (Scalia, J., concurring)). *Something* was deliberately placed beyond the scope of the legislative power by those who framed and ratified our constitution. To know what that something *was*, we must—in this case, at least—do more than simply understand the plain meaning of the words used. When history indicates that the framers chose text that carried jurisprudential baggage beyond its plain meaning, we must understand both the text and the baggage in order to do our job—which is to understand the provision the way it would have been understood at the time of ratification, as best we can.

Although the history of constitutional prohibitions on retroactive legislation goes back much further than 1849, we need look no further than *DeCordova* to find a clear indication that constitutional retroactivity bars were not understood, in 1876, to prohibit just any law that meets the dictionary definition of "retroactive." All of this Court's cases over the years, well-outlined in *Robinson*, take that same approach. We did say in *Tenet Hospitals Ltd. v. Rivera* that "[a] retroactive law is one that extends to matters that occurred in the past." 445 S.W.3d 698, 707 (Tex. 2014). But we then immediately explained, as we have many times, that this deceptively simple formulation of the retroactivity rule does not adequately capture the constitution's meaning. *Id.*

We first said as much at the beginning of the string, in *DeCordova*. As Chief Justice Hemphill wrote, "literal" application of the retroactivity bar to any law that "act[s] on things that are past" would give the clause

> a latitude of signification which would embarrass legislation on existing or past rights and matters to such an extent as to create inextricable difficulties, and in fact to demonstrate that it was incapable of practical application. A retrospective law literally means a law which looks backwards or on things that are past; or if it be taken to be the same as retroactive, it means to act on things that are past. If it be understood in its literal meaning, without regard to the intent, then all laws having an effect on past transactions or matters, or by which the slightest modification may be made of the remedy for the recovery of rights accrued or the redress of wrongs done, are prohibited equally with those which divest rights, impair the obligation of a contract, or make an act,

11

> innocent at the time it was done, subsequently punishable
> as an offense.

*DeCordova*, 4 Tex. at 475–76. If this idea—that a constitutional prohibition on "retroactive law[s]" cannot be given its literal effect for practical reasons—had first appeared in judicial opinions written *after* ratification of the 1876 Constitution, then we might suspect that the case law impermissibly undermines, rather than interprets, the constitutional text. Judges are not empowered to sidestep the text of the constitution because they consider it "embarrass[ing]" or "inextricabl[y] difficult[]." *Id.* at 475.

But that is not what was happening in *DeCordova.* Chief Justice Hemphill drew on an established tradition that had already rejected a rigidly literal application of retroactivity bars and related constitutional clauses. The framers of Texas's constitutions were aware of that tradition when they chose the words they did. The tradition included Chief Justice John Marshall, who wrote of the federal "obligation of contracts" clause:

> Taken in its broad, unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a state, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions, which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances.

*Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 628 (1819).

When seeking to understand our founding documents, we cannot ignore the historical traditions and legal foundations upon which they were constructed. *DeCordova* was known to the framers of the 1876 Constitution. In fact, Chief Justice Hemphill himself participated in

12

framing the 1845 version of the document, which likewise contained a prohibition on "retrospective laws."[6] *DeCordova* provides definitive evidence that the prevailing understanding in Texas's founding era was that constitutional prohibitions on retroactive laws did not withdraw from the Legislature all power "to act on things that are past." 4 Tex. at 475. Instead, such prohibitions should not be interpreted "without regard to the intent" for which they were enacted. *Id*. The framers of the 1876 Constitution knew that Texas courts would likely take *DeCordova*'s view of constitutional bans on retroactive laws when they wrote article I, section 16. They could have reacted to *DeCordova* by using different constitutional text that compelled a different result. They did not. We should therefore reject the suggestion that the 1876 Constitution's prohibition on retroactive laws was understood at the time of its adoption as a categorical prohibition on *all* backward-looking legislation.

## C.

Of course, identifying the "intent" behind the retroactivity bar, as *DeCordova* instructs, is by no means a straightforward enterprise. After holding that the clause must be interpreted with "regard to [its] intent," *DeCordova* concludes that "[l]aws are deemed retrospective and within the constitutional prohibition which by retrospective operation destroy

---

[6] Thomas W. Cutrer, *Hemphill, John*, HANDBOOK OF TEXAS ONLINE (last updated Jan. 1, 1995), https://www.tshaonline.org/handbook/entries/hemphill-john; *see also* JOURNALS OF THE CONVENTION, ASSEMBLED AT THE CITY OF AUSTIN ON THE FOURTH OF JULY, 1845, FOR THE PURPOSE OF FRAMING A CONSTITUTION FOR THE STATE OF TEXAS 4 (Austin, Miner & Cruger 1845) (listing John Hemphill as a Delegate from Washington County).

or impair *vested rights.*"  *Id.* at 479 (emphasis added).  This "vested rights" formulation drew on Justice Story's oft-quoted statement:

> [E]very statute, which takes away or impairs *vested rights* acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective . . . .

*Soc'y for the Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (emphasis added).  Because founding-era jurisprudence contemplated that constitutional retroactivity bars exist to protect "vested rights," we can safely gather that the intent of those who wrote and ratified the 1876 Constitution was to incorporate something like this "vested rights" understanding of retroactivity.

As *Robinson* observes, however, the concept of "vested rights" can quickly become murky.  Inconsistent application of it by courts over the years had illustrated "the problems in using 'impairs vested rights' as a test for unconstitutional retroactivity."  *Robinson*, 335 S.W.3d at 140. After analyzing the history of this Court's decisions, *Robinson* jettisoned the terminology of "vested rights" and instead distilled the following three considerations: "[1] the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; [2] the nature of the prior right impaired by the statute; and [3] the extent of the impairment."  *Id.* at 145.

In adopting this three-part inquiry, *Robinson* rejected a bright-line rule, advanced by a concurring Justice, under which the retroactivity bar categorically protects a plaintiff's right "to pursue a claim against his wrongdoer under the substantive laws as they existed at the time his or her cause of action accrued."  *Id.* at 153 (Medina, J.,

14

concurring).  That is precisely the right Hogan asserts, and *Robinson* clearly counsels that such a right does not enjoy absolute protection.

*Robinson* ultimately concludes that "no bright-line test . . . is possible." *Id.* at 145.  That statement is true enough, in the sense that every statute and every circumstance may present unique considerations courts must consider before declaring that a statute violates article I, section 16.  But *Robinson* and the legal history on which it builds are not devoid of useful rules that can be applied categorically in many cases.

The old categorical rule from *DeCordova*—grounded in the ancient concept of "vested rights"—proved confounding in its application.  *Robinson* responded by abandoning the language of "vested rights."  *See id.* (lamenting "the fundamental failure of the 'impairs vested rights' test").  But *Robinson* by no means discarded the underlying principle: Constitutional retroactivity bars exist to "protect[] the people's reasonable, settled expectations." *Id.* at 139.  *Robinson*'s three-part inquiry incorporates this principle by requiring consideration of "the nature of the prior right impaired by the statute." *Id.* at 145.

Thus, in addition to formulating its oft-cited three-part inquiry, *Robinson* also stands firmly for the distinct proposition that "protecting settled expectations" is a "fundamental objective" of the constitution's retroactivity bar. *Id.* at 139.  *Robinson*'s emphasis on "protecting settled expectations" stems from the very same considerations that caused earlier generations of judges to hold that retroactivity protections are limited to "vested rights."  We previously observed that the notion of "vested rights" derives from "[c]onsiderations of fair notice, reasonable

15

reliance, and *settled expectations*." *Owens Corning v. Carter*, 997 S.W.2d 560, 572 (Tex. 1999) (emphasis added). The concept of "vested rights" in the older case law is thus closely connected—though not identical—to the concept of "settled expectations" on which *Robinson* places great weight. Both linguistic formulations stem from a unified underlying principle, embedded in the law long before the 1876 Constitution and clearly stated by this Court as recently as 2003: "A law that does not upset a person's settled expectations in reasonable reliance upon the law is not unconstitutionally retroactive." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). *Robinson* affirms this rule, which we now apply to Hogan's claims against SMU.

**D.**

To establish that article I, section 16's bar on "retroactive law[s]" prevents application of the PLPA to his claims, Hogan must show he had a reasonable and settled expectation that he could recover money damages from SMU if the government forcibly shut down the campus and gave the school only the option of completing Hogan's degree program on the internet. He has not done so. Any expectation that a monetary judicial remedy would be available in those circumstances was entirely speculative and by no means settled. The Legislature does not exceed its authority by resolving lingering uncertainty about the viability of a speculative, untested theory of liability on which the common law already casts considerable doubt. And that is what we have here.

16

The common law has never faulted a contracting party whose performance is rendered impossible by either an Act of God[7] or an act of government.[8]  The coronavirus crisis was surely both, at least in the spring of 2020 when government orders specifically prohibited in-person higher education.[9]  If there is any settled expectation involved here, it is the long-settled expectation of all Texans that the law will not fault them for failing to perform a contract the government has ordered them not to perform by threat of criminal sanction.  In fact, were the Legislature to retroactively override *that* rule and impose post hoc liability on parties who reasonably relied during the pandemic on the common-law impossibility doctrine, article I, section 16 might very well be violated.  But legislative *codification* of the venerable impossibility

---

[7] *See, e.g.*, *Karakey v. Mollohan*, 15 S.W.2d 692, 693 (Tex. App.—El Paso 1929, no writ) ("Karakey, by his agreement with Mollohan, charged himself with an obligation possible to be performed, and he must make it good, unless its performance is rendered impossible by the act of God, the law, or Mollohan himself.").

[8] *See, e.g.*, *Hous. Ice & Brewing Co. v. Keenan*, 99 Tex. 79, 79 (1905) ("Appellant's proposition that the performance of a contract is excused by a supervening impossibility caused by the operation of a change in the law is correct . . . ." (quoting and adopting the court of appeals opinion)).

[9] The Governor of the State of Texas, Exec. Order GA-08 (issued Mar. 19, 2020), 45 Tex. Reg. 2271, 2271 (2020) (Governor's executive order initially closing schools); The Governor of the State of Texas, Exec. Order GA-16 (issued Apr. 17, 2020), 45 Tex. Reg. 2753, 2761 (2020) (Governor's executive order keeping schools closed for remainder of 2019-2020 school year). Hogan's claims cover only the spring of 2020, when government orders prevented SMU from holding in-person classes.  We do not address a circumstance in which a school not required by the government to shut down nevertheless chose to remain online because of the virus.

doctrine—which is essentially how the PLPA operates in Hogan's case—upsets no settled expectations and generates no retroactivity concerns.

Hogan objects that the impossibility doctrine might not completely foreclose all his claims for monetary relief, although there is no question that it guts the heart of his claim, which is that he is entitled to a refund because the school broke its promise of in-person education. He argues that the circumstances under which SMU's performance could be excused as impossible are too fact-dependent and uncertain to conclusively undermine his well-settled expectation that he could vindicate his contractual right to receive the on-campus experience for which he initially paid. But the impossibility defense applies in just this type of situation: when a party cannot both perform as agreed and, at the same time, "obey [a] governmental regulation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). As a result of unforeseeable government regulation, both SMU and its students "entertained a basic assumption about the contract that proved untrue." *Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 66 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The common-law impossibility defense would thus have limited SMU's liability considerably—and perhaps altogether—even in the absence of the PLPA.

Hogan questions, however, whether the fees he paid to support SMU's on-campus facilities should be refunded because the facilities were unavailable. He complains about the way the online classes were provided. And he questions whether SMU enjoyed reduced expenses after the campus closed and should therefore have to refund some of his

18

tuition and fees. But Hogan fails to acknowledge that SMU's "Student Rights and Responsibilities" agreement authorizes SMU to "in its discretion amend or change [its] terms at any time and from time to time." And whatever the precise contours of the contractual arrangement between Hogan and SMU, Hogan cites no precedent in which a student in his position has obtained monetary damages from a school in the event of the campus's unexpected closure for *any* reason—much less its forced closure at the hand of the government. We do not hold that such a recovery could never be available, only that we are pointed to no basis in the law to support a *settled expectation* of such a recovery. Nor are we pointed to a clear or settled method of assigning a dollar value to the difference between the in-person experience Hogan bargained for and the online experience he received.

Even assuming Hogan had a settled expectation that he would be entitled to a refund of some indeterminate amount if on-campus education became impossible, we cannot ignore that Hogan voluntarily accepted the altered form of performance offered by SMU. SMU offered students a shift to online classes to finish the semester, and it did so without a corresponding offer of tuition refunds or reduced fees. Rather than demand in-person school or his money back, Hogan did what millions of other disappointed students did. He accepted what the school could offer under the circumstances, and he got his degree. He had no reasonable expectation of a refund after he elected to continue his education and receive his degree under the amended terms SMU offered when it became impossible to perform as originally agreed. In other words, the deal Hogan now seeks to vindicate—under which he finishes

19

school online and gets a degree but does so for a reduced payment of tuition and fees—was never offered by SMU to Hogan or any of his classmates. 74 F.4th at 373.

Thus, any right of recovery that might have existed for Hogan was, at best, speculative and untested prior to the PLPA's enactment. Against this slightest of speculative private rights stands the right of Texans, through their elected representatives, to enact legislation in the public interest, which *Robinson* says must be considered. 335 S.W.3d at 145. By enacting the PLPA, the Legislature resolved legal uncertainty created by the novel circumstances of the pandemic in order to promote the speedy recovery of our society and our economy from one of the most traumatic episodes in our history. Whether or not we agree with the PLPA as a policy matter, we cannot deny the overwhelming strength and legitimacy of the public purpose it seeks to serve.

Finally, Hogan contends that even if his substantive right to recover damages from SMU was unsettled, he had a well-settled right to seek those damages in court, which the PLPA retroactively took away. But as we have said before, "changes in the law that merely affect remedies or procedure, or that otherwise have little impact on prior rights, are usually not unconstitutionally retroactive." *Id.* at 146. Any substantive right to recovery Hogan may have had in the absence of the PLPA is slight. Given that reality, the right he asserts is essentially the right to have a judge hearing a summary judgment motion tell him that the common law affords him little or no recovery, rather than to have a judge hearing a motion to dismiss based on the PLPA tell him that the Legislature has barred his claims. This slight difference is primarily

20

one of "remedies or procedure," not substance. *Id*. To the extent there is any substantive difference in the outcomes—which appears unlikely—it would be a minor difference with "little impact on prior rights." *Id*. In short, the procedural pathway by which Hogan's speculative claims yield him little or no recovery is not a matter with which the constitutional retroactivity bar is concerned.

## II.

"Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly[.]" *Id*. at 139 (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994)). "In other words, the rules should not change after the game has been played." *Id*. In Hogan's case, there were no settled rules governing a student's ability to recover damages from a university when the government forces the school to move online during a pandemic. That game had never been played before. The PLPA created new rules governing novel litigation in the wake of a novel and previously unimaginable event. Article I, section 16's prohibition on "retroactive law[s]" is not violated by the application of the PLPA to bar Hogan's breach-of-contract claim against SMU.

For these reasons, the answer to the certified question is No.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** April 26, 2024

21